438 So.2d 1091 (1983)
STATE of Louisiana
v.
William S. JOHNSON.
No. 80-KA-1653.
Supreme Court of Louisiana.
September 2, 1983.
Rehearing Denied October 28, 1983.
*1094 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., John H. Craft, Asst. Dist. Atty., for plaintiff-appellee.
Plauche F. Villere, New Orleans, for defendant-appellant.
BLANCHE, Justice.
William "Bill" Johnson and Kevin Seward were charged by grand jury indictment with first degree murder in violation of La.R.S. 14:30. A motion for severance was granted by the trial court. Thereafter, defendant Johnson filed a motion to suppress a confession given to police on the morning of his arrest. The trial court denied the motion and this court granted supervisory writs to review the suppression issue. We subsequently affirmed the trial court's ruling denying the motion to suppress, State v. Johnson, 363 So.2d 684 (La. 1978), and defendant Johnson stood trial for first degree murder. He was found guilty as charged, and, in accordance with the *1095 jury's recommendation, was sentenced to life imprisonment at hard labor. Defendant now appeals his conviction and sentence, advancing nine arguments.[1]
The evidence at trial revealed the following:
During the early evening hours of January 16, 1978, a young man rang the doorbell at the Washington Avenue residence of Dr. and Mrs. Thomas Crumpler in Orleans Parish. When Dr. Crumpler opened the door he found Kevin Seward, a man unknown to him at the time, standing on the steps. Seward pulled out a gun, forced his way inside the house, and shot both Dr. and Mrs. Crumpler, seriously injuring Dr. Crumpler and killing Mrs. Crumpler.
Defendant William Johnson, Mrs. Crumpler's son, had long nursed an intense and abiding hatred of his mother. When told of her death, Johnson joyously announced: "The bitch is dead. This is the happiest day of my life. I'll dance a jig on her grave." Police investigation thus quickly focused on Johnson and his lover, Kevin Seward. Both Johnson and Seward were arrested by police on January 18, 1978. During the course of interrogation, Johnson confessed to the murder of his mothera confession admittedly false in its principal details. In an effort to conceal Seward's identity as the actual assailant, Johnson told the police that a person named Brent Engles had helped him commit the murder. The authorities interviewed Engles, discounted him as a suspect and then returned to question Seward, who subsequently confessed to his role in the murder. Dr. Crumpler identified Seward as his assailant in a photographic line-up conducted at the hospital.
According to the State's theory of the case, Johnson recruited Seward to kill his mother out of an unnatural hatred of her and fear that he might lose his inheritance. The defendant argued in rebuttal that Kevin Seward is a disturbed and violent individual who acted entirely on his own in killing Mrs. Crumpler. The jury rejected defendant's argument and convicted him of first degree murder.

ARGUMENT NO. I
By this assignment, the defendant contends that the trial judge erred in denying his motion to sequester witnesses who were present in the courtroom during the voir dire examination.
At the outset of the voir dire examination, defense counsel requested the sequestration of all witnesses pursuant to La. C.Cr.P. art. 764. The trial judge denied the motion, stating that sequestration would be ordered "when we start the trial." Apparently, the trial judge was of the opinion that La.C.Cr.P. art. 764 does not apply during voir dire and that whether or not the witnesses are to be sequestered at that point is a matter within the discretion of the trial court.
La.C.Cr.P. art. 764 provides the rule for the sequestration of witnesses:
Upon its own motion the court may, and upon request of the state or the defendant the court shall, order that the witnesses be excluded from the courtroom or from where they can see or hear the proceedings and refrain from discussing the facts of the case or the testimony of any witnesses with anyone other than the district attorney or defense counsel. The court may modify its order in the interest of justice.
The language of La.C.Cr.P. art. 764 is mandatory. Under that article, the trial judge has no discretion when an order of sequestration is requested either by the state or the defendant. He must grant the order subject only to his power to modify it at the time it is granted or thereafter "in the interest of justice." State v. George, 346 So.2d 694 (La.1977); State v. Simpson, 259 La. 94, 249 So.2d 536 (1971). As explained by this court in the case of State v. Simpson, *1096 249 So.2d 536 (La.1977): "While article 764 provides that the court may modify its order in the interest of justice, the issuance of the order in the first instance is mandatory."
The jurisprudence has made it clear that the mandatory direction in La.C.Cr.P. art. 764 is not governed by any particular time sequence and that the court is required to act with respect to a sequestration motion whenever in the course of trial the motion is made. State v. Tauzier, 397 So.2d 494 (La.1981); State v. George, 346 So.2d 694 (La.1977); State v. Simpson, 259 La. 94, 249 So.2d 536 (1971). In fact, defense counsel's motion in the present case falls precisely within the time frame contemplated by this court in the case of State v. George, 346 So.2d 694, 699 (La.1977), wherein it was explained that "... defendant could have requested an order of sequestration at the commencement of voir dire examination."
That sequestration is available during voir dire is evident from an examination of the language of La.C.Cr.P. art. 764. That article provides that upon request of the state or the defendant, witnesses shall be excluded from where they can see or hear the "proceedings," and shall refrain from discussing "the facts of the case or the testimony of any witness." The obvious evil which is sought to be avoided is that witnesses will hear certain facts or evidence which may either consciously or subconsciously affect their testimony.
While it is true that no evidence is taken or testimony given during the voir dire examination, it is equally true that certain facts about the crime and about the defendant may be revealed to prospective jurors in order to determine if there is any bias or prejudgment on their part. To the extent that witnesses may be influenced by the revelation of those facts, or that the presence of witnesses may unduly hamper a party's constitutional right to a full voir dire examination, sequestration is appropriate.
Therefore, we conclude that when the defendant in the present case requested that the witnesses be sequestered during the voir dire examination, the trial judge had no choice but to grant the sequestration order, subject only to his power to modify it at that point or thereafter "in the interest of justice."
However, the fact that the trial court erred in its refusal to grant defendant's sequestration order does not automatically call for the reversal of defendant's conviction. The often repeated purpose of sequestration is to prevent witnesses from being influenced by prior testimony and to strengthen the role of cross-examination in developing the facts. State v. Kimble, 407 So.2d 693 (La.1981); State v. Lewis, 367 So.2d 1155 (La.1979); State v. Williams, 346 So.2d 181 (La.1977). Where the purpose of sequestration is not thwarted by the presence of witnesses during voir dire, and where defendant cannot be shown to have been materially prejudiced thereby, the refusal of the trial court to order sequestration may be considered harmless error.[2]
In the present case, defendant has pointed to nothing specific in the record, nor could anything be found which could possibly have influenced the testimony of a *1097 witness. In the absence of any showing that defendant suffered material prejudice as a result of the witnesses' presence during voir dire examination, or that the exposure was sufficient to affect the witnesses' testimony or to undermine the defendant's ability to cross-examine, we must conclude that the failure of the trial court to timely order sequestration did not constitute reversible error.[3]

ARGUMENT NO. II
The defendant maintains that the trial court erred in refusing to instruct the jury concerning the crime of negligent homicide.
At the completion of the presentation of evidence, the defendant filed a motion requesting a special jury charge including negligent homicide as a lesser included offense of first degree murder. The trial court denied defendant's motion without comment.
La.C.Cr.P. art. 814 lists the only verdicts responsive to a first degree murder indictment: guilty; guilty of second degree murder; guilty of manslaughter; and not guilty. Instructions on these permissible verdicts are mandatory. State v. Toomer, 395 So.2d 1320 (La.1981).
Special requested charges are governed by La.C.Cr.P. art. 807 which provides that a special charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly pertinent and correct. State v. Lane, 414 So.2d 1223 (La.1982); State v. Toomer, 395 So.2d 1320 (La.1981); State v. Telford, 384 So.2d 347 (La.1980).
In addition, La.C.Cr.P. art. 802 obligates the trial judge to charge the jury as to the law applicable to the case. Under this rule, the trial court is required to charge the jury, when properly requested, as to the law applicable to any theory of defense which the jurors could reasonably infer from the evidence. State v. Telford, 384 So.2d 347 (La.1980); State v. Marse, 365 So.2d 1319 (La.1978). This charge must be supported by the evidence, however. State v. Telford, 384 So.2d 347 (La.1980); State v. Clement, 368 So.2d 1037 (La.1979). As the United States Supreme Court noted in Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982): "... due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction. The jury's discretion is thus channelled so that it may convict a defendant of any crime fairly supported by the evidence."
For purposes of the present case, the determination of whether the trial court erred in refusing defendant's requested instruction on negligent homicide will depend upon whether the negligent homicide defense is fairly supported by the evidence.
Negligent homicide is the killing of a human being by criminal negligence. La. R.S. 14:32. In arguing for the instruction on negligent homicide, the defendant reasoned that by articulating his hatred for his mother in Kevin Seward's presence, not knowing that Seward was a psychotic and violent personality who would act out his expressed desires, he was guilty of criminal negligence. In support of this contention the defendant presented a substantial amount of expert testimony regarding the psychiatric status of Seward. That testimony depicts Seward as a sexually conflicted, oedipally disturbed, urgent, angry and sadistic person who is quite narcissistic and clever in setting up others to trigger his fury for him in such a way that he does not feel responsible for its outcome. He is described as being fully capable of episodic violence and as being a genuine threat to other males and females, especially parent/authority figures.
While such evidence is certainly damaging to the character of Seward, it is clearly not probative of defendant's alleged criminal negligence. Criminal negligence exists when there is such disregard of the interests *1098 of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances. La.R.S. 14:12.
According to the defendant's allegations, he did not know nor did he have reason to suspect Seward's violent and psychotic propensities. In fact, expert psychological testimony revealed that Seward was able to present himself well and to disguise his psychotic tendencies. In the absence of any evidence that it was foreseeable to a reasonably careful man that defendant's statements might produce a murderous reaction in Seward, no rational juror could have inferred that defendant's conduct was such a "gross deviation" as to amount to criminal negligence.[4] The defendant simply did not present any evidence which could fairly support a defense of negligent homicide. Consequently the trial court did not err in refusing to give a jury instruction on negligent homicide.

ARGUMENT NO. III
The defendant assigns as error the refusal of the trial court to order the production of a prior statement made by defendant's brother, Tom Johnson. During defense counsel's cross-examination of Tom Johnson, it was discovered that Johnson had given a written statement to police officers a few days after the murder. Defense counsel moved for production of that statement in order to determine if there were any inconsistencies between it and Johnson's trial testimony. Johnson later revealed that he had a copy of the statement at the residence where he was staying and that he had used the statement to refresh his memory in preparation for trial. Defense counsel at this point requested issuance of an instanter subpoena, which request was denied by the trial court. Thereafter, at the conclusion of Johnson's testimony, defense counsel filed a handwritten request for a subpoena duces tecum seeking production of the written statement. The trial court ordered production, but this order was subsequently quashed at the state's request.
As a rule, the state is not required to produce for inspection a police report or a prior statement for use in cross-examination of a state witness for impeachment purposes unless:
(1) the witness has physical possession of the report on the stand and testified from it. State v. Latin, 412 So.2d 1357 (La. 1982); State v. Perkins, 310 So.2d 591 (La.1975); or
(2) the witness testified exclusively from his past recollection recorded even though he does not have physical possession of the report on the stand. State v. Latin, 412 So.2d 1357 (La.1982); State v. Banks, 341 So.2d 394 (La.1976); or
(3) it is established that there is an inconsistency between the witness' testimony at trial and his prior statement. State v. Breaux, 366 So.2d 1375 (La.1978); State v. Lovett, 359 So.2d 163 (La.1978).
In the present case, the testimony clearly indicates that Tom Johnson was relying on his memory refreshed by his prior statement. He did not have physical possession of his statement when he testified, nor did defense counsel make any showing that Johnson's testimony differed from his prior statement. Accordingly, the statement was properly withheld from defense inspection.

ARGUMENT NO. IV
The defendant maintains that the trial court erred in admitting a hearsay statement made by Kevin Seward which implicated the defendant in the murder of his mother. The statement was made by Kevin *1099 Seward to John Carter, a former roommate of Seward's when Seward visited Carter at his place of employment some four days prior to the murder in order to pick up some clothes he had left in Carter's apartment. The statement which John Carter testified that Kevin Seward made was as follows: "He [Kevin] went on to say that he had a friend that lived uptown who had a two story mansion that really had it made, and he was going to pay him Two Thousand Dollars. He was going to give him a thousand dollars up front as good will, and another thousand dollars to kill his mother. He askedKevin asked to borrow a sport coat,a suitcoat or jacket because they were on their way out to the horse track. He said that the gentleman who was waiting in the car was going to point out his mother and the other party, I guess his stepfather." Carter identified the defendant as the gentleman who was waiting for Seward in the car. Carter also testified that Seward told him that the reason this man wanted his mother dead was that his grandmother was going to die and he feared his mother would receive the entire inheritance.
Carter's testimony was clearly hearsay, as it was in-court testimony of an out-of-court statement offered to show the truth of the matter asserted therein and resting for its value upon the credibility of the out-of-court assertor (in this case, Kevin Seward). State v. Arbuthnot, 367 So.2d 296 (La.1979); State v. Martin, 356 So.2d 1370 (La.1978). Nevertheless, the trial court allowed the testimony into evidence pursuant to La.R.S. 15:455, the co-conspirator exception to the hearsay rule.
According to La.R.S. 15:455:
Each coconspirator is deemed to assent to or to commend whatever is said or done in furtherance of the common enterprise, and it is therefore of no moment that such act was done or such declaration was made out of the presence of the conspirator sought to be bound thereby, or whether the conspirator doing such act or making such declaration be or be not on trial with his codefendant. But to have this effect a prima facie case of conspiracy must have been established.
As explained in the case of State v. Dupree, 377 So.2d 328, 330 (La.1979):
Before a co-conspirator's declaration may be introduced under this exception, a prima facie case of conspiracy must have been established and it must be shown that the declaration was made in furtherance of the common enterprise and during its continuation. [citations omitted] Introduction of a hearsay declaration without fulfillment of these requisites violates both the statute which prohibits the admission of hearsay evidence not falling within any exception to the rule, La.R.S. 15:434, and the constitutional guarantee of an accused's right to confront and cross-examine the witnesses against him [citations omitted].
In order to determine whether a prima facie case of conspiracy has been established, it is necessary that we first define the crime of conspiracy. Criminal conspiracy is defined in La.R.S. 14:26 as the agreement or combination of two or more persons for the specific purpose of committing any crime, provided however, that such an agreement or combination shall not amount to a criminal conspiracy unless, in addition to such combination or agreement, one or more of the parties does an act in furtherance of the object of the agreement or combination.
Proof of a conspiracy may be made by direct or circumstantial evidence. State v. Brown, 398 So.2d 1381 (La.1981); State v. Clark, 387 So.2d 1124 (La.1980); State v. Sheppard, 350 So.2d 615 (La.1977); State v. Kaufman, 331 So.2d 16 (La.1976).
This court has held that a prima facie case of conspiracy is presented when the State introduces evidence which, if unrebutted, would be sufficient to establish the fact of conspiracy. State v. Brown, 398 So.2d 1381 (La.1981); State v. Dupree, supra. For purposes of La.R.S. 15:455 however, the State cannot rely on the co-conspirator's declaration itself to supply the prima facie case of conspiracy. The conspiracy *1100 must be established by separate admissible evidence. State v. Meredith, 403 So.2d 712 (La.1981); State v. Millet, 356 So.2d 1380 (La.1978).
In the instant case, considering only the evidence presented by the State, we find that there was a prima facie showing of conspiracy. The evidence adduced at trial reveals the following: Dr. Crumpler, the defendant's stepfather and a victim of the shooting himself, identified Kevin Seward as the actual assailant of Mrs. Crumpler. Dr. Crumpler also testified that defendant Johnson had a long-standing, virulent hatred of his mother evidenced by previous threats on her life and by prior outbursts of violence towards her. Dr. Crumpler explained that one Sunday afternoon in 1971 as he and Mrs. Crumpler were leaving the home of Kitty Morris (defendant's grandmother), the defendant approached the couple waving a gun at them. According to Dr. Crumpler, the defendant stated: "I'm going to get rid of both of you. I'm not going to do it myself. I've got lots of friends who'll be quite willing to do it for a very small amount of money, and you can be sure when I do it, I'll have a good alibi. I'll either be off on a long trip or I'll be in the company of other people when it happens, because I won't be doing it myself."
Dr. Crumpler also testified that on one occasion, when Mrs. Crumpler refused to give the defendant $5,000 with which to start a business, the defendant set off a tear gas bomb in the Crumpler house. Finally, Dr. Crumpler related another incident in North Carolina in which defendant and Mrs. Crumpler became involved in an argument. The defendant is reported to have struck Mrs. Crumpler, forcing her to call the police to have him physically evicted from the premises.
Tom Johnson, the defendant's brother, also testified as to threats defendant had made against their mother's life. According to Tom, in August and September of 1977, the defendant told him on at least three occasions that he wanted their mother dead. Apparently, the defendant was concerned over the fact that if his grandmother pre-deceased his mother, Mrs. Crumpler would inherit all of his grandmother's money and then move to North Carolina in order to avoid Louisiana's forced heirship rules. Tom testified that defendant told him that he was going to kill their mother and that "I'm going to hire someone to do it. I'm going to have the perfect alibi. When it happens, I'll be here at Kitty's. And, I'll be watching TV, and I'll then get him to come back and give me the news that it's done."
India Bradley, the defendant's cousin, testified that she went to the defendant's house the night of the murder to tell defendant of his mother's death. She testified that Kevin Seward was present with defendant when she arrived. According to Ms. Bradley, when she told defendant that his mother was dead, both defendant and Kevin Seward reacted joyously. Defendant said: "The bitch is dead. And Tom [Dr. Crumpler], what about Tom? Is he going to make it?" Mrs. Bradley testified that she had not yet mentioned Dr. Crumpler or his condition at the time that defendant made this statement. After that, defendant is reported to have turned to Kevin Seward and handed him a tranquilizer, telling him: "Take it. You deserve it."
The defendant's former roommate, Allen Armstrong, also testified on behalf of the State. Armstrong stated that Kevin Seward had been living with defendant on and off for approximately two weeks prior to the murder. He corroborated Ms. Bradley's version of the events of that evening and of the defendant's reaction to the news of his mother's death. Armstrong also added that the night of the murder defendant handed him some files concerning his grandmother's estate and asked him to hide them from the other members of defendant's family.
Other evidence presented by the State to link defendant to the murder of his mother included bullets found in a tree in the backyard of defendant's residence. A ballistics expert from the police department testified that the bullets removed from the tree were *1101 fired from the same gun that was used to kill Mrs. Crumpler.
Finally, it was established that following the arrest of defendant and Kevin Seward, defendant told police that he was the one who shot Dr. and Mrs. Crumpler, and that Seward had nothing to do with the incident. This statement, which proved to be false, was obviously made in an effort to protect Seward.
The above facts, circumstances, and the permissible inferences which can be drawn therefrom, left unexplained, are sufficient to establish an agreement between Seward and defendant for the purpose of committing a crime. The recited factsthat defendant had personal and financial motives for wanting his mother dead, that he openly and repeatedly threatened her, that the murder occurred in the exact manner predicted by defendant in his threats, that Seward was the actual assailant, that defendant and Seward were living together, that the two were found together immediately after the murder,[5] that Seward had no ostensible reason for wanting Mrs. Crumpler dead, that bullets were discovered which connected defendant to the murder weapon, and that defendant himself confessed to the murder in an effort to protect Sewardprovide a prima facie showing that defendant and Seward, by their words and actions, agreed and combined to kill Mrs. Crumpler.
The fact that defendant denies any complicity in the crime and maintains that Seward acted entirely on his own, does not detract from the facts and circumstances set forth above, which, if unexplained, establish a prima facie case that Seward committed the murder and that he did so at the request and under the direction of defendant.
Furthermore, consistent with the requirement in La.R.S. 15:455, it is apparent that Seward's hearsay statement was made in furtherance of the common enterprise and during its continuation. State v. Dupree, 377 So.2d 328 (La.1979). At the time that Seward visited Carter, the conspiracy's prime objective, the murder of Mrs. Crumpler, had not yet been achieved. Therefore, Seward's declaration was obviously made during the continuation of the conspiracy.
As to the requirement that the statement be made "in furtherance of the common enterprise," that requirement has clearly been met. As Seward himself explained to Carter, the purpose of his visit with Carter was to obtain a sport coat to wear to the race track where he was going in order to learn the identity of his future victims. The fact of the conspiracy was revealed to Carter as part of Seward's explanation of his need for the sport coat. Certainly, obtaining a coat in order to be appropriately dressed at the track and proceeding to the track in order to identify the prospective victims is an act in furtherance of the common enterprise. It is a direct step in the advancement of the conspiracy's objective. Accordingly, Seward's hearsay declaration was admissible under La.R.S. 15:455. McCormick on Evidence, § 267 (2d Ed. 1972).

ARGUMENT NO. V
The defendant contends that the trial court was guilty of instances of judicial misconduct sufficient to violate its duty of strict impartiality. More specifically, the defendant argues that the trial judge's comments to defense counsel throughout the proceedings were calculated to discredit defense counsel in the eyes of the jury and had the effect of communicating the judge's feeling that the defendant should be found guilty.
Essential to the concept of a fair trial is the requirement of complete neutrality on the part of the presiding judge. cf. State v. Williams, 375 So.2d 1379 (La. *1102 1979); State v. Hammler, 312 So.2d 306 (La.1975); La.C.Cr.P. arts. 772 and 806. A trial judge's disparaging remarks or intemperate criticism of defense counsel may constitute reversible error when such remarks adversely influence and prejudice the jury against the defendant. State v. Hammler, 312 So.2d 306 (La.1975). In order to constitute reversible error, however, the effect of the improper comments must be such as to have influenced the jury and contributed to the verdict. State v. Gallow, 338 So.2d 920 (La.1976); State v. Hammler, 312 So.2d 306 (La.1975); State v. Simpson, 247 La. 883, 175 So.2d 255 (La.1975).
In the present case, the defendant cites numerous examples of antagonism between the trial judge and defense counsel which erupted during the course of voir dire examination. We have reviewed each of the challenged exchanges and conclude that the comments of the trial judge did not rise to so substantial a level as to adversely affect the availability of a fair and impartial trial or to prejudice defendant in any significant manner.[6] In reaching this conclusion, we note that the scope of examination of prospective jurors is controlled by the trial court's discretion. La.C.Cr.P. art. 786. The defendant has made no allegation that the trial judge's statements amounted to an abuse of that discretion. Furthermore, defense counsel was given the opportunity during the voir dire examination to ask potential jurors if the exchanges between the judge and himself had affected their judgment or impartiality, thereby assuring that no prejudice resulted to defendant. Finally, it must be noted that the antagonism between defense counsel and the trial judge, much of which was provoked by impertinent and argumentative comments on the part of defense counsel, subsided dramatically during the actual presentation of evidence so as not to have deprived the defendant of a fair and impartial trial.
Accordingly, we find that the trial court's comments do not constitute reversible error as they did not influence the jury or contribute to the verdict.

ARGUMENT NO. VI
The defendant contends that the trial court erred in refusing the jury's request to rehear the testimony of certain witnesses. During its deliberations, the jury asked to rehear the testimony of India Bradley. The trial judge denied the request, relying on La.C.Cr.P. art. 793, the article governing the use of evidence in the jury deliberation room. La.C.Cr.P. art. 793 provides:
A juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury...
In interpreting this provision, we have repeatedly held that La.C.Cr.P. art. 793 absolutely prohibits the repetition of testimony to the jury. State v. Perkins, 423 So.2d 1103 (La.1982); State v. Gaston, 412 So.2d 574 (La.1982); State v. McCully, 310 So.2d 833 (La.1975). The general reason for this prohibition is a fear that the jurors might give undue weight to the limited portion of the verbal testimony thus emphasized. State v. McCully, 310 So.2d 833 (La.1975); State v. Freetime, 303 So.2d 487 (La.1974).
Although we recognize that a majority of jurisdictions permit testimony to be re-read to the jury upon its request, the enactment of La.C.Cr.P. art. 793 represents an express legislative choice in the matter. Accordingly, we conclude that under the express provisions of La.C.Cr.P. art. 793, the jury was not entitled to rehear the testimony of India Bradley. The trial court did not err in so ruling.

ARGUMENT NO. VII
By this assignment, the defendant complains that there was insufficient evidence to support his conviction.
*1103 In the case of State v. Graham, 422 So.2d 123, 129 (La.1982) we had occasion to consider the constitutional and statutory standards by which the sufficiency of evidence is to be judged in this state. We observed that:
The Due Process Clause of the Fourteenth Amendment requires this court to review the evidence upon which a criminal conviction is based to determine whether it is minimally sufficient. A defendant has not been afforded due process, and his conviction cannot stand, unless, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Additionally, we are governed by our statutory rule as to circumstantial evidence: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. R.S. 15:438.
In brief, the defendant argues that his conviction was based solely on circumstantial evidence and that such evidence did not exclude every reasonable hypothesis of innocence, as required by La.R.S. 15:438. Defendant maintains that the evidence used to convict him did not exclude the reasonable hypothesis that Seward was psychotically inclined to commit the crime, and when confronted with defendant's hatred for his mother and desire to see her dead, acted out defendant's desires on his own and for reasons known only to him.
Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue; whereas, circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.[7]State v. Austin, 399 So.2d 158 (La.1981). Where there is direct evidence, the trier of fact weighs the credibility of the evidence and the reviewer under Jackson defers to that trier of fact, assuming the proven facts most favorable to the State. Where an essential element of the crime is not proven by direct evidence, La.R.S. 15:438 applies. That rule restrains the fact finder, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if every reasonable hypothesis of innocence is excluded. State v. Shapiro, 431 So.2d 372 (La.1983), (on rehearing).
In the present case, the defendant was charged with first degree murder. The essential elements of that crime are: (1) the killing of a human being; (2) when the offender has the specific intent to kill and has offered or given anything of value for the killing. La.R.S. 14:30(4). Direct evidence offered by the State proved that: (1) Seward alone killed the victim; and (2) Seward told Carter that the defendant had hired him to kill the victim. Thus, direct evidence was offered to prove every essential element of the crime charged. As a result, the proper standard of review in this instance is that espoused by Jackson. La. R.S. 15:438 is not applicable.
Applying the Jackson standard to the facts of this case, we conclude that defendant was not denied due process of law and that his conviction is clearly based on evidence from which, when viewed in the light most favorable to the prosecution, *1104 a rational juror could find that the essential elements of defendant's crime had been proved beyond a reasonable doubt. In reaching this conclusion, we note that the direct evidence offered by the State to prove its case is also supported by circumstantial evidence. That evidence consisted largely of testimony demonstrating that defendant hated his mother and had threatened her in the past, that he reacted to news of his mother's death with glee and inquired into the condition of his step-father before being told that his step-father had also been shot, that defendant discussed the method he would employ to kill his mother with his brother, that defendant was concerned that he would lose his inheritance if it came under his mother's control, and that the same gun that killed his mother was used to fire a shot into a tree in defendant's backyard. Viewing this evidence as a whole in accordance with the standard enunciated in Jackson, it is clear that the evidence is constitutionally sufficient to support the defendant's conviction.

ARGUMENT NO. VIII
The defendant contends that the transcript of his trial is incomplete, edited, altered, and doctored so as to exclude perjury.[8]
The portion of the transcript which defendant points to as missing is the argument of counsel on the issue of whether a prima facie case of conspiracy was proved prior to the introduction of John Carter's hearsay statement. The argument was made out of the jury's presence. Thus, there is no gap in recorded testimonyonly the missing argument of counsel.
The remainder of defendant's complaints center around allegations that the testimony of witnesses Tom Johnson and Detective Rodrigue has been edited and altered. These complaints are unsubstantiated beyond defendant's mere allegations.
In State v. Ford, 338 So.2d 107, 110 (La. 1976), this court stated:
A slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal would not cause us to reverse defendant's conviction.
In the present case, the missing portion of the transcript consists not of testimony, but of the argument of counsel. Such argument is immaterial to an adequate review of the trial court's ruling. Furthermore, a review of the remainder of defendant's allegations reveals no inconsistencies, alteration, or editing on the face of the record. The defendant's complaints, therefore, are immaterial, and unsubstantiated. For these reasons the assignment lacks merit.

ARGUMENT NO. IX
The defendant maintains that the trial court erred in admitting his confession into evidence because the State failed to meet its burden of proving beyond a reasonable doubt the free and voluntary nature of defendant's statements. Defendant alleges that during the interrogation of Seward and himself at police headquarters, Seward, who was detained in a room down the hall from defendant, was beaten by police. Defendant maintains that, upon hearing the cries of his lover down the hallway, he falsely confessed to the crime in order to end the beating and to avoid similar treatment of himself.
These precise issues were raised and decided adversely to defendant in the earlier decision in State v. Johnson, 363 So.2d 684 (La.1978). In Johnson, the defendant had filed a pre-trial motion to suppress his confession and the trial court had denied that motion. On review, a majority of this court affirmed the denial of the suppression motion, concluding that the State had sufficiently rebutted Johnson's allegations of coercion, intimidation, or any other undue *1105 influence. According to that majority opinion, the testimony of the interrogating officers at the suppression hearing directly contradicted all the testimony of Seward and Johnson and proved beyond a reasonable doubt that Johnson's confession was freely and voluntarily given. See State v. Johnson, 363 So.2d 684 (La.1978).
In State v. Humphrey, 412 So.2d 507, 523 (La.1982) (on rehearing), we announced that, as a rule:
When this court considers questions of admissibility of evidence in advance of trial by granting a pre-trial application for supervisory writs (rather than deferring judgment until an appeal in the event of conviction), the determination of admissibility does not absolutely preclude a different decision on appeal, at which time the issues may have been more clearly framed by the evidence adduced at trial. Nevertheless, judicial efficiency demands that this court accord great deference to its pretrial decisions on admissibility, unless it is apparent, in light of the subsequent trial record, that the determination was patently erroneous and produced an unjust result.
In the present case, the voluntariness issue, already fully litigated in the pre-trial suppression hearing, was not re-litigated at trial, and the confession was read to the jury after a brief predicate. Defense counsel failed to present any new evidence or argument[9] tending to show that this court's pretrial decision on admissibility was patently erroneous and produced an unjust result. In the absence of such a showing, this court will not overturn its earlier decision denying defendant's motion to suppress the confession.

DECREE
For the reasons assigned, the defendant's conviction and sentence are affirmed.
DIXON, C.J., concurs, disagreeing with arguments 3 and 7.
CALOGERO, J., concurs, disagreeing with the treatment of Argument IV.
LEMMON, J., concurs.
NOTES
[1] Although listed, assignments of error numbers 1, 2, 4, 7, 8, 11-19, 24, 25, 26, 29, 30, 31, 33-47, 50, 51, and 52 were neither briefed nor argued. Therefore, they are deemed abandoned. State v. Dewey, 408 So.2d 1255 (La. 1982); State v. Matheson, 407 So.2d 1150 (La. 1981).
[2] In reaching this conclusion we are careful to distinguish the facts of the instant case from those presented in State v. Simpson, 259 La. 94, 249 So.2d 536 (La.1971). In Simpson, the request for sequestration was made after the case was "half over." The trial judge denied the request on the grounds that it came too late. Consequently, no sequestration was ordered at all. Witnesses were present during the entire course of the proceedings. In ordering a reversal of Simpson's conviction, a majority of this court noted: "We could not examine the entire record in the instant case to determine whether the error is harmless. The transcript of testimony is not included in the record as made up ... Since a statutory right accorded the defendant was clearly violated, we cannot presume that the defendant was not prejudiced." State v. Simpson, supra at 539.

In the present case we are hampered by no such impediment. We have before us a complete record of the proceedings, including a full transcript of the voir dire examination. Furthermore, the defendant in this case was not totally deprived of his statutory right. Sequestration was ordered before opening arguments commenced.
[3] This position is consistent with our holding in State v. Williams, 346 So.2d 181 (La.1977), wherein we ruled that the presence of a witness during voir dire and at each stage of the proceeding could be considered harmless error.
[4] To hold otherwise would produce the anomalous consequence that anyone who inadvertently verbalized a hatred of a third party and desire to see that party dead would be guilty of criminal negligence if in fact that third party was subsequently killed by the person to whom this hatred was expressed. While such conduct on the part of an individual may be morally reprehensible, it is certainly not criminal within the meaning of La.R.S. 14:32. A person is under no "duty" to refrain from expressing his opinion of another, however undeserved.
[5] Prima facie evidence of conspiracy has been found where the defendant and another individual are shown to have been together both prior to and following the commission of an offense to which the defendant has been circumstantially linked. State v. Gutter, 393 So.2d 700 (La.1981); State v. Kaufman, 331 So.2d 16 (La. 1976); State v. Clark, 387 So.2d 1124 (La. 1980).
[6] It is significant to note that defendant points to no instance in which the trial court's remarks could be construed as comments upon the evidence, intended to impress the jurors with the court's opinion as to the defendant's guilt or innocence. La.C.Cr.P. art. 772.
[7] In State v. Graham, 422 So.2d 123, 129-130 (La.1982), the distinction between direct and circumstantial evidence was described as follows:

The characterization of evidence as "direct" or "circumstantial" points to the kind of inference which is sought to be drawn from the evidence to the truth of the proposition for which it is offered. If the inference sought is merely that certain facts are true because a witness reported his observation and the assumption that witnesses are worthy of belief, the evidence is direct. When, however, the evidence is offered also for some further proposition based upon some inference other than merely the inference from assertion to the truth of the fact asserted, then the evidence is circumstantial evidence of this further fact-to-be-inferred. McCormick, § 185 p. 435.
[8] This argument in the same or similar form has been presented to this court before. State ex rel Johnson v. Louisiana, 400 So.2d 673 (writ denied 1980); State ex rel. Johnson v. Louisiana, 404 So.2d 276 (writ denied 1981); State ex rel Johnson v. Louisiana, 412 So.2d 95 (writ denied, 1982).
[9] In a brief filed in this court, defendant raises the argument that the signature on the transcript of confession is not his, but a forgery. Defendant has never raised this ground for suppression before in any form. Nevertheless, the argument is clearly without merit. Two police officers testified that they observed defendant sign the confession and a rights of arrestee form. Furthermore, defendant himself testified at the suppression hearing that he signed the confession in a manner different from his normal signature so that he could contest the matter when it came up later.