466 So.2d 520 (1985)
STATE of Louisiana, Plaintiff-Appellee,
v.
Nathan ARNOLD, Defendant-Appellant.
No. CR84-651.
Court of Appeal of Louisiana, Third Circuit.
March 6, 1985.
Rehearing Denied April 16, 1985.
Writ Denied June 7, 1985.
*522 Anatole J. Plaisance, Baton Rouge, Richard S. Hoover, Lafayette, for defendant-appellant.
Michelle Jackson, Robin Rhodes, Asst. Dist. Attys., Lafayette, for plaintiff-appellee.
Before DOUCET, LABORDE and YELVERTON, JJ.
YELVERTON, Judge.
Nathan Arnold, defendant, convicted of second degree murder of Joseph Rodney Cormier, in violation of La.R.S. 14:30.1, and sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence, appeals the conviction based on 22 assignments of error.
Only the briefed assignments of error (1, 2, 3, 4, 11, 13, 15, 17, 18, 19, 20, 21, 22), and the unnumbered but briefed issue on the sufficiency of evidence, will be addressed. Issues not briefed are considered abandoned. State v. Dewey, 408 So.2d 1255 (La.1982).

FACTS
At about 6:00 A.M. on March 20, 1982, Rodney Cormier and Nathan Arnold got in an argument at Al's Place, a lounge in Lafayette, Louisiana. There was a brief fight which was stopped and the parties separated. The bar owner, Allison Thomas, asked Arnold to leave and he and a witness, Randy Dalcour, forcibly escorted the defendant outside to the parking lot. While outside, Arnold discovered that he had a small wound in his lower abdomen, as though from a knife. Arnold remained in the parking lot from five to twenty minutes while Cormier stayed in the bar. Arnold testified that he pulled out his .25 caliber gun and shot Cormier when Cormier walked out of the bar with a knife in his hand and came towards him. Others, however, testified that Arnold attempted to re-enter the bar and then fired a gun towards Cormier who was unarmed. Two shots were fired. The first one hit the door, and the other struck Cormier, killing him.

ASSIGNMENTS OF ERROR NOS. 11 and 19
By assignments of error 11 and 19, the defendant claims that prejudice resulted from the failure of the state to disclose allegedly exculpatory statements made by the witness, Randy Dalcour, and the failure of the state to produce the name of another witness, James Champagne.
Early in the case defendant formally requested production of statements containing favorable material. The state did not submit any statements.
During the trial on September 26, 1983, while the state witness Randy Dalcour was testifying, the trial court complied with the defendant's request that the court examine Dalcour's written statement and measure it against the witness's courtroom testimony for inconsistencies. The court found one: Dalcour had put in his statement that he did not know the identity of the parties involved in the crime, but during his testimony at trial he referred to them by name. The trial judge considered the discrepancy to be "Brady" material which was favorable to the defendant, and then and there he ordered that the statement be released to the defendant. After the statement was delivered to the defense counsel, the examination and testimony of Randy Dalcour continued.
Before cross-examining the witness the defense counsel moved for a mistrial on the grounds that the state failed to timely provide exculpatory statements to the defendant. He argued that Dalcour's inconsistency concerning the identification of the parties, his mention of his being cut by the victim, his noting that the defendant had been cut, and his comment that others had been at the scene of the crime, were all exculpatory statements which should have been made timely available to the defense. The trial judge denied the mistrial motion, noting that the only thing in Dalcour's statement of Brady significance was the one discrepancy about whether the witness knew the parties. The other claimed Brady material involved matters already well known to defendant. After this motion *523 was denied, cross-examination of Dalcour proceeded.
The defendant now argues that "Brady" was violated and the trial court erred in denying the motion for mistrial. In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the state, upon request, must disclose evidence favorable to the accused where it is material to guilt irrespective of the good faith or bad faith of the prosecution. The Brady rule has been extended to encompass cases in which the nondisclosed evidence pertains to the reliability of key state witnesses. State v. Davenport, 399 So.2d 201 (La.1981).
However, according to State v. Smith, 430 So.2d 31 (La.1983), the untimely disclosure of exculpatory evidence will not constitute reversible error unless its late disclosure so prejudices the defendant that he is denied his constitutional right to a fair trial. In Smith, unlike Brady, where the withheld information was discovered only after conviction, the exculpatory evidence became available to the defense during trial. Smith concluded that, although the trial court abused its discretion in denying the motion for mistrial, it was not reversible error because the defendant had ample opportunity to make use of the discovered information during the trial of the case so as to avoid prejudice.
We reach the same conclusion. Since the statement was released to the defense counsel before cross-examination of the witness and a recess was allowed, the defendant's counsel had ample opportunity to thoroughly cross-examine the witness. During cross-examination the witness admitted that he could not make a positive identification of the defendant or of the victim.
Although the defense counsel did not question the witness as to the stomach wounds of the defendant and as to others present at the scene of the crime, that evidence, as the trial judge stated, was either known or discoverable by other means. The release of Dalcour's statement to the defense was, therefore, not untimely and did not prejudice the defendant. The denial of the motion for a mistrial was proper.
In these assignments of error the defendant also referred to the failure of the state to timely provide the defendant with the name and address of another state witness, James Champagne. Defendant claims that the state never divulged the name of Champagne who, nevertheless, testified at trial. The state, on the other hand, contends that although it did not know about Champagne at the time the discovery motions were filed, it later informed the defendant that he was a witness. The state asserts that, furthermore, Champagne's name and address were added to the witness list which was filed in the clerk's office and which was available to the defendant. In any event, the defense had a copy of Champagne's statement before he began his testimony.
Before Champagne testified at trial, the trial judge viewed the statement and noted that it contained exculpatory features which related to the time between the defendant's exit from and attempted return into the bar. The trial judge considered that these features would have a bearing on "heat of blood" and the "differentiation between manslaughter and second-degree murder." For this reason he ordered that the statement be given to the defense, and then allowed the witness to testify.
The defendant now claims that the late discovery of this exculpatory evidence prejudiced him. As stated earlier, the standard of review in such a case is whether the late discovery of the exculpatory evidence denies the defendant the right to a fair trial. The record reveals no denial of the right to a fair trial.
The defense had the opportunity with the help of the statement to fully cross-examine the witness and present the exculpatory evidence to the jury. Furthermore, the statement did not create a reasonable doubt as to the defendant's guilt. State v. Vaccaro, 411 So.2d 415 (La.1982). Although the witness testified that three to *524 five minutes elapsed between the time the defendant exited the bar and the time he attempted to re-enter, Allison Thomas, the bar owner, testified the time period was ten to fifteen minutes, while Vivian Lee Mier testified that it was fifteen to twenty minutes. The evidence, therefore, was used as effectively as possible to bolster defendant's alternative contention that he acted in the heat of passion.
The defendant also claimed that the late disclosure of Champagne's statement was prejudicial because Champagne was the only person who testified that the defendant used force in his efforts to get back into the premises before shooting Cormier, and because Champagne was the only eye witness testifying that the defendant was the aggressor. The record, however, shows otherwise. Randy Dalcour and Allison Thomas both testified to facts indicating the defendant was the aggressor.
It is hard to conceive how an earlier disclosure of the requested information regarding these witnesses could have had a significant impact on the determination of the defendant's guilt, in light of the substantial evidence against him.
These assignments of error lack merit.

ASSIGNMENT OF ERROR NO. 4
In this assignment of error defendant refers to the failure of the state to timely provide the defendant with an autopsy report. Defendant claims that on June 7, 1982, he filed a request for a bill of particulars, and on January 27, 1983, he filed a motion for discovery. On February 1, 1983, the state replied to the motion by submitting a copy of the coroner's autopsy report. The trial was in September. The defendant sought dismissal of the charges because of the state's alleged failure to timely submit the exculpatory evidence requested in the bill of particulars. The defendant now claims that the trial court erred in denying that motion.
He claims that the medical report contained favorable material which he could have used to show that the victim had a reputation of being a dangerous person and a knife fighter. The defendant specifically referred to the mention in the autopsy report of recent unhealed lacerations on the victim's body.
The trial court denied the motion stating that the autopsy report was a public record that the state was under no obligation to provide to the defendant, and which the defendant could have obtained on his own. This was a correct ruling. In State v. Williams, 438 So.2d 1212 (La.App. 3rd Cir. 1983), in response to a similar argument, we upheld the trial court, saying "the defendant had every right and opportunity to secure a copy of the autopsy report from the moment it was filed in the Coroner's office."
The defendant received the report in February, and the trial began in September. He had sufficient time to prepare a defense based on the evidence in the report. Furthermore, he exercised his right to fully cross-examine the doctor who performed the autopsy. Thus, there is no merit to this assignment of error.

ASSIGNMENTS OF ERROR NOS. 2 and 13
In these assignments of error defendant claims that the trial court erred in excluding Detective Bob Johnson of the City of Lafayette Police Department from the rule of sequestration of witnesses.
Detective Johnson was the chief investigating officer in the case. He made a brief initial appearance as a witness on the question of whether a statement made by the defendant to him would be admitted into evidence. At that appearance the officer testified only that on the day of the crime he had taken a tape-recorded statement from the defendant, but that he had later discovered that the tape recorder had malfunctioned and the tape was blank. It was the state's intention to have him testify as to the substance of the tape; he did not do so, however, on this initial appearance on the witness stand.
Having been excluded from the rule of sequestration, Detective Johnson thereafter remained in the courtroom as other witnesses testified. Eye-witnesses of the *525 crime, Allison Thomas and James Champagne, as well as other investigating officers, preceded him on the stand. After they finished, Detective Johnson again testified. The defense again objected to his exclusion from the rule of sequestration.
The sequestration statute, La.C. Cr.P. art. 764 provides as follows:
"Upon its own motion the court may, and upon request of the state or the defendant the court shall, order that the witnesses be excluded from the courtroom or from where they can see or hear the proceedings and refrain from discussing the facts of the case or the testimony of any witness with anyone other than the district attorney or defense counsel. The court may modify its order in the interest of justice."
This article has been interpreted to mean that it is mandatory for the trial judge to grant the order subject only to his power to modify it in the "interest of justice." State v. Johnson, 438 So.2d 1091 (La.1983). If there is no interest of justice purpose involved, the refusal of the trial court to order sequestration may yet be considered harmless error if the purpose of the sequestration is not thwarted by the presence of the witness during the testimony of the others and if the defendant cannot be shown to have been materially prejudiced thereby. Id. The purpose of sequestration is to prevent witnesses from being influenced by prior testimony and to strengthen the role of cross-examination. State v. Narcisse, 426 So.2d 118 (La.1983).
In the present case the purpose for Detective Johnson's exclusion from the rule was so he could assist the district attorney. This was for the convenience of the state, not primarily for the interests of justice.
We must determine whether allowing Detective Johnson to stay in the courtroom thwarted the purpose of the sequestration order in this case and whether it prejudiced defendant.
In State v. Narcisse, supra, as here, a police officer was permitted to remain in the courtroom throughout the course of the trial and was then allowed to testify. The Louisiana Supreme Court found that this was a violation of the sequestration rule but harmless error because the officer's testimony did not focus on the same issues as did the testimony of the witnesses before him. He and the other witnesses testified to different aspects of the crime scene. In the case before us, however, Officer Johnson's testimony did relate to that of previous witnesses. The other witnesses testified as to how the crime occurred, and the officer related his recollection of the statement made by the defendant as to how the crime occurred. Unlike the circumstances in Narcisse, here there is a possibility that Detective Johnson's testimony may have been influenced by that of earlier witnesses.
Any such influence, however, is not indicated in the record. Some of the details of the crime as related by Johnson were different than those told by other witnesses. Only Johnson mentioned that the defendant had told him that he had acted in self-defense and that the victim was walking out of the bar with a knife in hand. Champagne and Thomas testified that the victim was approaching the door of the bar without a knife and the defendant opened the bar door. Although these details were different and, thus, not indicative of influence, some crucial details were similar. Both Johnson (relating the defendant's statement) and Champagne testified that only a few minutes elapsed between the time the defendant exited the bar and the time he shot the victim. Thomas, however, testified that the time lapse was ten to fifteen minutes. Determining the time lapse would have a bearing on "heat of blood" and, thus, the differentiation between manslaughter and second degree murder. If Johnson was disposed to tailor his testimony after others, one would expect him to have sided with Thomas, rather than Champagne. This is no indication of influence.
Although it is not possible to determine if the officer was in fact influenced by the prior testimony, as the above comments *526 suggest there is no evidence that the defendant was materially prejudiced by such possible influence. As to testimony dealing with the time lapse, conflicts existed everywhere. Vivian Mier testified that the lapse was twenty minutes. Finally, as the discussion of the sufficiency of evidence issue will later show, regardless of the officer's testimony there was sufficient evidence to find the defendant guilty of second-degree murder. Although the trial court erred in refusing to sequester the witness, the error was harmless. These assignments have no merit.

ASSIGNMENTS OF ERROR NOS. 15 and 18
In these assignments the defendant questions the admission of the testimony of Detective Johnson dealing with the defendant's statement.
On the day of the crime, March 30, 1982, Detective Johnson tape-recorded a statement by the defendant. A few hours later he discovered that the recorder had malfunctioned and the tape was blank. When Johnson was contacted by the prosecutor he immediately made a report of the statement. At trial he was permitted to testify as to the statement, a motion to suppress his testimony having been denied.
The defendant now argues that this was error. Besides contending that the statement was not free and voluntary, he argues that his consent to make the statement was vitiated when the statement was not taped as he had assumed.
The record shows that before Detective Johnson testified about the statement, the state complied with La.C.Cr.P. art. 703(G), introducing evidence concerning the circumstances surrounding the making of the statement for the purpose of enabling the jury to determine the weight to be given to it. These circumstances clearly show that the statement was properly admitted into evidence under La.R.S. 15:451 because it was affirmatively shown that the statement was free and voluntary.
There is no evidence that the defendant made the statement solely on the condition that it would be taped.
Defendant also argues that the admission of the statement violates La.R.S. 15:450 which provides:
"Every confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford."
Interpreting this article in State v. Marmillion, 339 So.2d 788 (La.1976), in which an officer also testified as to a statement, the court stated:
"[I]n the absence of proof to the contrary, the fact that the purported statement of the accused as testified to by the investigating officer does not consist of a verbatim reiteration of the conversation between them, due to the witness' inability to recall or other valid explanation, the rights of the accused under Section 450 are not violated. The law does not require the production of nonexistent portions of the confession or portions which cannot be recalled. State v. Domino, 234 La. 950, 102 So.2d 227 (1958). See also State v. Odom, 292 So.2d 189 (La. 1974); State v. Bickham, 239 La. 1094, 121 So.2d 207 (1960); State v. Kennedy, 232 La. 755, 95 So.2d 301 (1957); State v. Desroches, 48 La.Ann. 428, 19 So. 250 (1896)."
State v. McDonald, 387 So.2d 1116 (La. 1980) further held that for the rule outlined in La.R.S. 15:450 to be satisfied, it suffices that the substance of the statement be shown.
In the case before us the trial judge told the officer that he could testify only as to the substance of the statement. The officer's testimony bears quoting:
"Q And will you please now tell the members of the Jury what you recall the Defendant telling you, concerning the incident that happened at Al's Lounge on March 30th 1982?

*527 "A He had been in the lounge and got into a verbal argument with another white male. That stopped for several minutes and then another verbal argument was initiated.
"That second verbal argument escalated into a physical fight. At that point, he related that the fight was broken up by Al and some other man. He stated he did not have a knife when I asked him if he had a knife or had produced a knife. He said he did not have a knife and had not cut anybody. I then asked him if he knew he was cut and he stated `Not at this time.'." [sic]
"He continued by saying that the fight was broken up by Al and another man and he was taken outside. A few minutes later, he realized that he had been stabbed in the stomach. This upset him. He pulled his gun and started walking back towards the door. At this point, he saw Mr. Cormier walking from inside of the lounge, towards the door, with a knife in his hand. And as Mr. Cormier opened the door outwardly, he shot him one (1) time."
As this shows, the officer testified only as to the substance of the statement and did not attempt to recollect every detail of the defendant's statement.
These assignments of error lack merit.

ASSIGNMENTS OF ERROR NOS. 1 and 17
In these assignments the defendant argues that the trial court should have found that the petit jury venire had been tainted, and should have granted the defendant's motion to set aside the entire venire for that reason.
The defendant's assignments of error concern two incidents. The first was a conversation between the victim's brother, Ray Cormier, and two prospective jurors. At a hearing on the motion to dismiss the venire, these two prospective jurors testified that they had spoken to Ray Cormier in the hallway of the courthouse and that the only fact mentioned about the case was that the victim was his brother. The trial judge excused the two jurors, dismissed the motion, and stated that the hearing had not shown any taint, but the court reserved to defendant the right to re-urge the motion if there appeared to be any taint during additional voir dire.
During voir dire the remaining jurors stated that they had not overheard any such conversation. When questioned individually they again responded that they had not overheard any conversation between the victim's brother and other jurors. The trial judge repeatedly admonished the jurors not to discuss the case with anyone.
The second incident was not developed factually, because no one knew much about it, but it was charged during the voir dire that defendant's wife, Vanessa Arnold, had been seen talking to some jurors. During the hearing conducted by the trial judge as a result of this rumor, to determine if any information about the case had in fact reached the jurors, the defendant was unable to produce any such proof. Nevertheless, the prospective jurors who had had contact with Mrs. Arnold were later excused either by the court, the state, or the defense, and never got on the trial jury. All of the prospective jurors placed on voir dire after this incident were thoroughly examined, numerous times, on whether they had heard, overheard, or knew anything about the case prior to trial. Each response was negative.
The trial court properly found that there was no taint, and no prejudice, resulting from these incidents. These assignments have no merit.

ASSIGNMENTS OF ERROR 20, 21, and 22
By assignments of error nos. 20 and 21, the defendant asserts that the trial court erred in denying him a new trial (No. 20) and by excluding evidence proffered in support of his motion for a new trial (No. 21). The grounds asserted are that a prejudicial communication from a third party occurred with one petit juror outside the courtroom, and that that communication was further communicated by that juror to the remaining jurors. Specifically, it was alleged that one of the jurors at a beauty *528 shop during the trial was told by her beautician that the defendant was a rapist, and that she in turn communicated that information to the other jurors. These allegations of misconduct were made by one of the jurors, Mrs. Susan Lagneaux.
The trial judge conducted a hearing. All allegations of Mrs. Lagneaux were contradicted by the other 11 jurors and the alternate. The juror who was allegedly given the damaging information by her beautician flatly denied that that had happened.
Had this outside communication occurred and had it been brought to the attention of the jury, as alleged, unquestionably it would have been prejudicial to the accused. State v. Marchand, 362 So.2d 1090 (La. 1978). There would have been no need to show actual prejudice. State v. Graham, 422 So.2d 123 (La.1982). However, the trial judge determined that no possibility of prejudice had occurred, simply because the events alleged by Mrs. Lagneaux did not happen. The record fully supports this ruling.
In an affidavit executed after the trial Mrs. Lagneaux, who, incidentally, did not agree with the jury verdict, made another accusation of jury misconduct. She said that the jury during its deliberations talked about Arnold's chances for a parole or pardon. The trial court limited the scope of the evidentiary hearing conducted into this and all other matters raised by Mrs. Lagneaux's charges "to objective demonstration of extraneous factual matter disclosed to the jury, but no further." By assignment No. 22, defendant complains that this limitation of evidence on the motion for a new trial was improper.
We believe that the trial judge's decision was eminently proper. Having found that the minority juror was simply incorrect in the primary charge of wrongdoing she leveled against her fellow jurors, the trial judge was justified in giving little credence to the further accusation that the jury had talked about wrong things during deliberation. A further evidentiary hearing was not required under these circumstances, and for the additional reason that it would have opened the door to a prohibited inquiry into jury misconduct concerning which no juror is competent to testify under LSA-R.S. 15:470. Under this statute, no juror is competent to testify to his own or his fellows' misconduct or to give evidence to explain, qualify, or impeach any indictment or any verdict found by the body of which he is or was a member. The statute must yield and our courts are required to take evidence upon wellpleaded allegations of juror misconduct violating an accused's constitutional rights, and set aside the verdict and order a new trial upon a showing that a constitutional violation occurred and that a reasonable possibility of prejudice exists. State v. Graham, supra. However, in the present case there was no showing that a constitutional violation occurred, much less that a reasonable possibility of prejudice existed. It should be noted that the subject of parole or executive clemency was not brought up by the state during closing arguments, or at any other time, and if it came up at all, it was a subject that spontaneously arose during jury deliberations. Whatever may be the propriety of such extraneous considerations during jury deliberations, such rigid control over the thought processes of jurors discussing their deliberations is neither practicable nor necessary. If the present jury mentioned the possibility of parole or clemency, we might say it violated idealistic jury conduct, but we cannot say it violated defendant's constitutional rights.
These assignments of error have no merit.

SUFFICIENCY OF EVIDENCE
The defendant challenges the sufficiency of the evidence supporting the conviction. Although this issue does not appear as a numbered assignment of error, it crops up in defendant's arguments in other assignments of error, and the subject was specially briefed by both the defendant and the state. Hence, we will consider it.
The test for sufficiency of evidence is found in Jackson v. Virginia, 443 U.S. 307, *529 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which holds that the reviewing court, viewing the evidence in the light most favorable to the prosecution, looks to the determination of whether any rational trier of fact could have found that every element of the crime was proved beyond a reasonable doubt.
Second degree murder is the killing of a human being where the offender has the specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1. Since specific criminal intent is a state of mind, it need not be proved as a fact but may be inferred from the circumstances of the case and actions of the defendant. State v. Kahey, 436 So.2d 475 (La.1983). La.R.S. 15:445.
From the record it appears that the state presented sufficient evidence to convince any rational trier of fact that every element of the crime of second-degree murder was proved beyond a reasonable doubt. A state witness, Allison Thomas, the bar owner, testified that after the defendant had been pulled out of the bar, and stayed outside for a while, he attempted to re-enter, reached for a gun, and shot twice towards Cormier who was unarmed. The first shot struck the door, and the second one killed Cormier.
Champagne, a bartender, testified that when he saw the defendant attempt to re-enter the bar, he tried to lock the door but had time only to grab the door against his chest. The defendant, not being able to open the door, then fired his gun at it. Champagne let go of the door and backed away. According to him, defendant then stepped in and fired the gun at Cormier who was unarmed. Dr. James Freeman autopsied the body and testified that the gunshot wound caused Cormier's death.
Although the defendant testified that he acted in self-defense, claiming that Cormier was coming towards him with a knife, the evidence presented above by the state would be sufficient to convince a rational trier of fact, beyond a reasonable doubt, that when he shot and killed Cormier, the defendant had the specific intent to kill or inflict great bodily harm.
For all of these reasons, the conviction is affirmed.
AFFIRMED.