STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-179


STATE IN THE INTEREST OF T.H.


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC-2013924
HONORABLE HERMAN C. CLAUSE, JUDGE

**********

J. DAVID PAINTER
JUDGE

**********

Court composed of Sylvia R. Cooks, Marc T. Amy, and J. David Painter, Judges.

ADJUDICATION AFFIRMED.
DISPOSITION VACATED AND REMANDED.


Cooks, J., dissents and assigns written reasons.

**Michelle Breaux, Assistant District Attorney**
**Michael Harson, District Attorney**
**District Attorney's Office, Courthouse Building**
**P. O. Box 3306**
**Lafayette, LA 70502**
**(337) 232-5170**
**COUNSEL FOR THE STATE OF LOUISIANA**

**Jane Hogan**
**P. O. Box 3622**
**Lafayette, LA 70502**
**(337) 232-9345**
**COUNSEL FOR DEFENDANT-APPELLANT:**
        **T.H.**

**PAINTER, Judge.**

The sixteen-year-old Defendant, T.H., was adjudicated guilty of theft, a violation of La.R.S. 14:67, and sentenced to six months with the Office of Juvenile Justice, suspended, placed on six months of active probation, and ordered to complete forty hours of community service. T.H. now appeals, alleging that the evidence is insufficient to support the conviction. For the following reasons, we affirm the adjudication but vacate the disposition and remand the matter for resentencing with instructions to the trial court to order credit for time spent in secure detention, if any, prior to the imposition of disposition, as required by La.Ch.Code art. 898(A), to inform T.H. of the two-year prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8, and to order the probation order to correctly reflect the adjudication hearing.

## FACTS AND PROCEDURAL HISTORY

Detective Tracy Gerard, who was employed by the Lafayette Parish Sheriff's Office, also worked as a security guard at Wal-Mart located on 1229 Northwest Evangeline Thruway. Detective Gerard recalled working at Wal-Mart on May 22, 2013. He was with Rachelle Hebert, Asset Protection Manager for Wal-Mart, in the security office. While watching closed circuit television of the store from the security office, Ms. Hebert pointed out to Detective Gerard two individuals in the shoe aisle.[1] The detective described what he saw while watching the closed circuit television, stating in pertinent part:

> A     [A]nd I witnessed the defendant and a black female together, and the black female was pushing a basket that had several items in the basket. There looked to be some type of either knapsack or purse on the top portion of the basket, and it appeared to be open. He was -- he had something in his hands and --

---

[1] The State refers to the in-store surveillance as "closed circuit T.V." whereas T.H. refers to it as video surveillance.

Q  [by the STATE] Who's "he"? Is "he" the defendant?

A  I'm sorry. The defendant. The defendant had something in his hands, and he kept playing with it, and it looked like he was wrapping something around it. I couldn't tell at the time. And he handed the item to the female, and he turned his back to the female and looked down the aisle, as though he was looking to make sure --

. . . .

Q  Okay. What happened next?

A  The black female then took that item and placed it into the --

Q  Took what item?

A  The item that he handed her and turned around and placed it into the bag that was on top of the basket. She then proceeded to take other items that were in the basket and also placed them into the bag.

Q  Do you know what those other items were?

A  It was several different items that I've listed in the report that we confiscated later.

Q  And those items were already in the basket?

A  Yes.

. . . .

Q  Could you tell the Court, then, what other items were in the basket that were handed to Ms. Charles?

A  There was the beach pants that were there, and there was a – they use their code, so it's kind of difficult to explain. And then men's swim trunks, some Superman T's, some woven shorts, some boys' T's, some rash guard, there was two (2) packs of that, some woven shorts, another pack, some jersey tank tops, another pair of shorts, and a jersey tank, and the total was like seventy dollars and seventeen cents ($70.17).

Q  Let me ask you, do you know how those items got into the basket? Were you --

A  No.

Q  -- able to view that on closed circuit?

A  When she drew my attention to them, there was items [sic] in the basket.

2

Q        When you're saying "she" --

A        Rachelle, the loss prevention. When she said, "Look, they look suspicious," that's when I started. And I see the two (2) individuals next to the basket, and there's items [sic] already in the basket.

Q        Okay. And were you able to identify what item the defendant handed to the person pushing the basket?

A        The only item we removed that had anything wrapped around it was the men's swim trunks, and what was wrapped around it was the drawstring.

Q        Okay. And in viewing the closed circuit, where did [T.H.] retrieve this item?

A        When I first noticed him, he had it in his hands.

        . . . .

Q        All right. Did you monitor [T.H.] and the young lady, once you saw this on closed circuit TV?

A        (No response.)

Q        From the time you saw him give the item to the young lady until the time they exited the store?

A        Once they started moving, we lost them off of that particular camera.

Q        Okay.

A        And then -- I don't remember if Rachelle followed them from that point. I went to the door to wait for them to come to the exit point.

Q        Okay. Was there any explanation given as to the items in the purse?

A        Not that I recall.

Q        All right. Did you, at any point, speak with [T.H.]?

A        As he exited the store, I told him he was under arrest for shoplifting.

Q        Did he have any explanation?

A        Not that I recall.

Q        All right. And [T.H.], the person that you identified, is the same person that you saw on the closed circuit TV?

A Yes.

 . . . .

Q [by the Defendant's Attorney] Officer, earlier you testified that on the last –once [T.H.] handed the shorts, or the trunks, to Ms. Charles, that the camera lost footage, or they were not able to see at that point. Isn't it correct that, at that point, [T.H.] went in one direction and Ms. Charles went in another direction?

A When he handed them to her?

Q Yes. When he handed her his shorts, he went in another direction. Could you see that from the video?

A Yeah, they were still in frame, they were still on the aisle. He just turned and looked, as though – I mean, I've been doing it for twenty-four (24) years --

Q I know, but you can't say what is in someone's mind.

A Huh?

Q So did he go in another direction, or did he not?

A No, he stayed right there. She put the items in the purse.

Q So your testimony is, he stayed with her the entire time?

A (Nods head indicating an affirmative response.)

Q And --

A He wasn't looking at her, no. He was looking in the opposite direction from where she was, but he was standing next to her.

 . . . .

Q [by the State] [A]t the time the items was [sic] placed in the purse, where was [T.H.]?

A He was there, but his back was to her.

 . . . .

A [W]hen I noticed him playing with the cord or whatever, she was kind of looking at some stuff on the side. She stands back up, he hands her the object, he turns towards the camera, she goes into the top portion of the basket and places it into the bag.

4

Detective Gerard testified that Ms. Charles and T.H. moved away from the camera that he was watching. Detective Gerard then went to the door to wait for the two to exit. Detective Gerard testified as follows regarding the stop of T.H. and Ms. Charles:

> Q   Okay. All right. Where was the stop made of [T.H.] and the other lady?
>
> A   As they exited the store.
>
> Q   Okay. Did they have to pass registers?
>
> A   Yes.
>
> Q   Did they pay for the items?
>
> A   No.
>
> Q   Okay. And when they were stopped, where were the items found?
>
> A   They were found in her purse.

The detective explained that T.H. did not exit the store at the same time as Ms. Charles. Ms. Charles exited first, and Detective Gerard stopped her at that time. He described T.H. as "he kind of hung back." Detective Gerard testified that T.H. did not walk out of the store with anything or conceal anything in his pocket, pants, coat, or anywhere.

Ms. Hebert was with Detective Gerard in the security office watching T.H. and Ms. Charles via closed circuit television. Ms. Hebert testified regarding Ms. Charles stating in pertinent part:

> A   I know it was supposed to have been a relative. I do not -- I know it wasn't the mother. The mother did not come until later, when we called. But the female was younger than [T.H.], and then, like I said, there was a, if I had to guess, maybe a five (5) or six (6) year old that was with them as well.

Ms. Hebert recalled that Ms. Charles had merchandise in the bottom of her basket which she was gathering and pushing to the back of her basket. T.H. was holding

merchandise in his hand, and he was balling it up and wrapping a drawstring around the merchandise. Ms. Hebert testified that: "She [Ms. Charles] started concealing merchandise from the basket into the purse, and he handed merchandise to her and she concealed it into her purse." The pertinent exchanges occurred regarding the concealment:

> Q [The State] [W]hile watching the security camera, was this gentleman in a position to see the young lady placing the items in her purse?
>
> A [Ms. Hebert] Yes, he was.
>
> Q Did he make an effort to stop the concealment?
>
> A No, he did not.
>
> . . . .
>
> Q [T.H.], what was he doing when the young lady put it in her purse?
>
> A He was standing next to her. While she was placing merchandise inside of her purse, he was basically looking around, I guess, to see if anybody was --
>
> . . . .
>
> BY MS. BREAUX:
>
> Q When you say "looking around," I'm assuming the young lady is pushing the basket?
>
> A Yes, she is.
>
> Q What is T.H. -- where is he in relation to the young lady pushing the basket?
>
> A He's on the side of her.
>
> Q Can you describe what he's doing? Is he watching her? Is he shopping elsewhere? Can you describe what he is doing?
>
> A He's on the side of her. They are pushing the basket on the back aisle of shoes, and he's watching her with the merchandise and then as well as looking down aisles as they pass the aisles.
>
> . . . .

6

Q      [The Defendant's Attorney] And he was looking at her?

A      During the concealment?

Q      Uh-huh.

A      Yes.

Q      So if the officer said that he was not – that he was looking in the other direction, that would not be correct?

A      Correct. I mean, whenever she was concealing, he was watching her conceal, and then he also whenever -- like I stated, whenever she was concealing, when they continued to walk -- Because when they were concealing, they were stopped. Whenever they started concealing -- or when they finished concealing, they started walking, and he was looking around to the side aisles.

Ms. Hebert described the item that the juvenile gave to Ms. Charles as swim trunks.

When asked what happened after the item was concealed in the purse, Ms. Hebert

responded:

A      We continued to follow the individuals until they came up to the front of the store. After they passed all points of sale, entered the vestibule, we opened the door to the Loss Prevention office[,] and [Detective] Gerard asked the individuals to come in the office.

On cross-examination, Ms. Hebert clarified that she did not approach T.H. or Ms.

Charles, but Detective Gerard did.

At the conclusion of the State's case, T.H.'s attorney moved for a directed

verdict and the following pertinent exchange occurred:

MS. BROWN [Defense]: Yes. Motion for Directed Verdict on the issue of, he was not charged as a principal in the matter, he was charged as the person who actually took an item, which he didn't take. There was no testimony saying he took anything. And based on that particular motion, I would like to Motion for Directed Verdict on the fact that he didn't take, and taking is an integral part of the theft, with intent to permanently deprive.

THE COURT: Response?

MS. BREAUX[ State]: Judge, he was an active participant in the theft. Not only did he have the trunks in his hand, did he place the drawstring around it to make it smaller, he handed it to the person to

conceal, and he was right alongside of the person. Didn't make any attempt to stop from concealing. The only thing he didn't do was place it into the purse. So he's just as guilty of theft as the person putting it in the purse.

THE COURT: Motion for Directed Verdict denied.

T.H. testified that his mom had dropped himself, Ms. Charles, and his five year old brother at the store. Ms. Charles was purchasing items for her boyfriend and asked T.H. if he wanted something. T.H. picked some shorts. T.H. stated that he did not wrap a string around the shorts because the shorts did not have a string on them. T.H. admitted that he handed the shorts to Ms. Charles. T.H. was of the opinion that Ms. Charles was going to buy him the shorts because she had bought things for him in the past. The following pertinent exchange occurred between T.H. and his attorney:

Q      Did you know of her taking something before?

. . . .

A      No.

. . . .

Q      Has she ever made purchases for you before?

A      Yes, ma'am.

Q      Have you ever made purchases for her before?

A      When I have, the money, yes, ma'am.

Q      You have bought things for her -- items for her?

A      (Nods head indicating an affirmative response.)

Q      So when she asked to go to the store with you, it was not anything unusual?

A      No, ma'am.

Q      And it's your testimony that you did not wrap anything around the shorts because there was no string on the shorts?

8

Q     No, ma'am. I just had the shorts in my hand.

Q     And you gave them to her?

A     Yes, ma'am.

Q     Did you have any intent to take those shorts from the people from the store?

A     No, ma'am.

Q     Any of the other items that they testified to they found in her purse, did you have anything to do with those items?

A      No, ma'am. They weren't even -- they weren't my size.

Q     They weren't your size?

A     No, ma'am.

Q     Had they been your size, would you have had anything to do with them?

A     No, ma'am.

On cross-examination, T.H. explained that he picked out the shorts and held them up to see if they would fit him.  When he saw the price, he knew he could not buy them. According to T.H., Ms. Charles offered to buy them for him.  T.H. recalled that Ms. Charles put the shorts on top of the handle of the shopping cart that one uses to push the shopping cart.  He admitted that Ms. Charles's purse was in the front part of the shopping cart where children usually sit and that the shorts were near the purse.  T.H. stated that after he handed her the shorts, "we went our separate ways."  T.H. denied seeing Ms. Charles put the other items in her purse. T.H. testified that he went to purchase some candy for school.  T.H. stated that he had money to buy the candy, but before he could do so, the security officer called him over to talk.  T.H. denied seeing Ms. Charles pass the cash register.  During cross-examination by the State, the following pertinent exchange occurred:

Q     Did you see Ms. Charles purchase anything at all?

9

A    No, ma'am.

Q    She didn't purchase a bottle of Sprite?

A    No, ma'am.

Q    You didn't see her go through the checkout and purchase a bottle of Sprite?

A    No, ma'am.

Q    All right. The next time you see her, then, is when she's with an officer?

A    Yes, ma'am.

The State offered no evidence to rebut T.H.'s testimony that he did not see Ms. Charles go through the checkout line. T.H. stated that he saw the security officers stop Ms. Charles. He explained that after the security officers stopped Ms. Charles, the security officers motioned for him to come over to them. He testified that he did not know that Ms. Charles had not purchased the shorts until he was called into the security office at Wal-Mart.

On re-direct examination by the State, Detective Gerard testified that he did not motion for T.H. to come over to him. He explained that he stopped T.H. while he was walking out of the store and that Ms. Charles was already in the security office.

The swim trunks, Ms. Charles' purse or bag, and the video were not introduced into evidence.

On October 9, 2013, the State filed a Petition charging T.H., age sixteen, with theft, valued at $75.78, a violation of La.R.S. 14:67.

An adjudication hearing was held on December 16, 2013. The trial court found T.H. guilty of the charged offense. On that same date, the trial court sentenced T.H. to six months with the Office of Juvenile Justice, suspended, and

10

placed T.H. on six months of active probation. T.H. was ordered to complete forty hours of community service.

On appeal, T.H. assigns two errors:

1. The juvenile court erred when it overruled defense's objection to hearsay testimony concerning the Wal-Mart surveillance video. The state did not make a showing that the video was destroyed or unavailable. Given the divergent accounts of what occurred from the state's witnesses, the video should have been produced as not only "best evidence" but also as potentially exculpatory evidence.

2. The juvenile court erred by adjudicating T.H. guilty of theft despite insufficient evidence. Considering the conflicting testimony by state witnesses, the failure of the state to prove T.H. had a requisite intent to steal, and reliance on testimony concerning an unproduced surveillance video, the evidence was insufficient to convict T.H. of theft.

## DISCUSSION

### *Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find several errors patent.

At the appearance hearing to answer the State's petition, the trial court failed to advise the juvenile as required by La.Code Crim.P. art. 855. In *State v. Erven*, 36,332 (La.App. 2 Cir. 10/23/02), 830 So.2d 368, the court held that at the appearance hearing to answer the state's petition, the court is required, pursuant to La.Ch.Code art. 855, to first determine if the juvenile is capable of understanding his/her rights, and if so, to advise the child of his/her rights, including the nature of the proceedings, the nature of the allegations of the petition, the right to an adjudication hearing, the right to appointed counsel, and the right against self-incrimination. In *State in Interest of J.G.*, 94-194 (La.App. 5 Cir. 7/26/94), 641 So.2d 633, the court applied the harmless error analysis when the trial court failed

to advise the juvenile of his rights under art. 855. In *J.G.*, the court found the error was harmless since the record reflected that the juvenile was represented by counsel when he appeared in court and that he pled not guilty to the charges against him. In the present case, the record indicates the juvenile was represented by counsel and denied the allegation. Thus, we find that the error was harmless.

The trial court failed to conduct a disposition hearing, and the record before this court does not indicate the Defendant waived the hearing. Louisiana Children's Code Article 892 provides, "[p]rior to entering a judgment of disposition, the court shall conduct a disposition hearing. The disposition hearing may be conducted immediately after the adjudication and shall be conducted within thirty days after the adjudication. Such period may be extended for good cause." Louisiana Children's Code Article 893 provides in pertinent part:

> A. At the disposition hearing, unless the child waives the presentation, the court shall hear evidence as to whether the child is in need of treatment or rehabilitation and shall make and file its findings.

> B. All evidence helpful in determining the proper disposition, including oral and written reports, the report of the predisposition investigation, any reports of mental evaluation, and all other evidence offered by the child or the state shall be received by the court and may be relied upon to the extent of its probative value even though not admissible at the adjudication hearing. Upon motion of the district attorney or the child, the court may hear testimony from the victim of the offense.

> C. Counsel for the state and for the child shall be afforded an opportunity to present evidence and to examine and controvert written reports so received and to cross-examine individuals preparing the reports or other witnesses who give testimony at the hearing. Sources of confidential information need not be disclosed.

In *State ex rel. T.W.*, 09-532, pp. 8-10 (La.App. 3 Cir. 10/7/09), 21 So.3d 465, this court found merit to the juvenile's assigned error on appeal that the trial court erred in failing to conduct a disposition hearing. This court held in pertinent part:

12

Immediately after the adjudication in the case at bar, the following transpired:

> THE COURT: All right. The Court finds the defendant guilty as charged and orders the defendant to serve--
>
> MS. NEUMANN: Judge, before you set that, we might just indicate that he's been in jail since August, which is six (6) months. He has been a model prisoner. He has helped in--
>
> THE COURT: This is a serious offense. I understand. This kid is in denial, and I don't like what I've heard. And he's going to serve until his twenty-first (21st) birthday because that's as long as I can lock him up for.
>
> MS. BREAUX: You have to, Judge. You have no discretion.
>
> THE COURT: Yes.
>
> MS. BREAUX: Thank you.

> The Juvenile asserts that familiarity with a juvenile and a lengthy history with the trial court does not absolve the trial court from conducting a disposition hearing. Further, counsel's failure to object to the immediate disposition did not waive his right to a hearing. In support of his argument, the Juvenile cites *State in the Interest of O.R.*, 96-890 (La.App. 5 Cir. 2/25/97), 690 So.2d 200; *State ex rel. E.S.*, an unpublished opinion bearing docket number 08-41 (La.App. 4 Cir. 8/20/08); and *State in the Interest of C.D.*, 95-160 (La.App. 5 Cir. 6/28/95), 658 So.2d 39.

> In *C.D.*, 658 So.2d 39, and *O.R.*, 690 So.2d 200, the fifth circuit vacated the dispositions and remanded for disposition hearings where the record failed to reflect that disposition hearings had been held, and the record failed to reflect that the juveniles waived such a hearing.

> In *State in the interest of K.G.*, 34,535 (La.App. 2 Cir. 1/24/01), 778 So.2d 716, the trial court conducted a summary disposition without a hearing. The second circuit vacated the disposition and remanded for a disposition hearing or a clear waiver of the hearing. In reaching its decision, the second circuit chose not to interpret defense counsel's silence as a waiver.

> In light of the mandatory language of La.Ch.Code art. 892, we vacate the disposition and remand the case for a disposition hearing.

*Id.* at 471-72.

In *State in the Interest of C.D.*, 95-160, pp. 5-7 (La.App. 5 Cir. 6/28/95), 658 So.2d 39, 41-42 (footnotes omitted) on error patent review, the fifth circuit held:

> La.Ch.C. art. 892 requires the trial court to conduct a disposition hearing prior to entering a judgment of disposition. Upon review, we do not see anywhere in the record where a disposition hearing was held nor do we find any indication such a hearing was waived by defendant. The purpose of such a hearing is to hear evidence in order to make a determination of whether the child is in need of treatment or rehabilitation. Once the trial court finds the child is in need of treatment or rehabilitation, the court is to make the appropriate disposition as set forth by La.Ch.C. arts. 895-899. La.Ch.C. art. 894.
>
> . . . .
>
> Because the trial court's discretion in ordering the length of time a juvenile is to remain in custody for an armed robbery conviction is determined by the disposition hearing, we have no choice but to vacate the sentence and remand the matter for a disposition hearing.

*State in the Interest of O.R.*, 96-890 (La.App. 5 Cir. 2/25/97), 690 So.2d 200 involved a similar situation. The juvenile argued on appeal that the court erred in sentencing him without a presentence investigation and relying only on the court's limited experience with him. The court noted that although a presentence investigation report is not required, the trial court erred in not holding a disposition hearing as required by art. 892. The appellate court held:

> In the case before us, the court did not conduct a disposition hearing. While counsel did not object to the court's immediate disposition without a hearing, there is nothing in the record to indicate that counsel waived the juvenile's right to a hearing or his right to present evidence as set forth in LSA-Ch.C. art. 893. Although the Juvenile Judge was familiar with O.R. and his lengthy history with the court, the Judge's familiarity with the juvenile does not dispense with the need for a disposition hearing. Absent a waiver by the juvenile, which does not appear in this record, the Juvenile Judge erred in failing to conduct a hearing prior to entering a judgment of disposition. See *State in Interest of C.D., supra*.
>
> Accordingly, we vacate the disposition and remand for a disposition hearing in accordance with LSA-Ch.C. arts. 892 and 893.

*Id.* at 202.

14

In *State in the Interest of K.G.*, 34,535 (La.App. 2 Cir. 1/24/01), 778 So.2d 716 (footnote omitted), the juvenile argued on appeal that he was denied due process because no evidence was presented at the disposition hearing. The court held:

> Although in this case the trial court classified the proceedings as a disposition hearing, it is clear that no evidence of K.G.'s need of treatment or rehabilitation was adduced. Therefore, in effect, the court rendered a summary disposition without a hearing. Of course, La. Ch.C. art. 893 provides for a waiver of the presentation of evidence. In *State in Interest of O.R.*, 96-890 (La.App. 5th Cir.02/25/97), 690 So.2d 200, the court vacated an immediate disposition made without a hearing, and remanded the case for a disposition hearing. Therein, the court noted that counsel's failure to object did not amount to a waiver of the juvenile's right to a hearing or his right to present evidence as set forth in La. Ch .C. art. 893. *See, also, State In Interest of C.D., supra*.
>
> We recognize the factual distinction regarding the timing of the sentencing in *State in Interest of O.R., supra*, and the present case. Nevertheless, we determine that distinction to be of no moment to the resolution of the present issue because, as noted above, the trial court here also effectively rendered a summary disposition without a hearing, although not immediately after the adjudication. Considering these cited cases and the mandatory language utilized by the legislature in La. Ch.C. art. 893, we decline to interpret counsel's mere silence as a waiver of the presentation of evidence by K.G. Accordingly, it is necessary that we vacate the disposition and remand for a disposition hearing or a clear waiver of those proceedings in accordance with La. Ch.C. arts. 892, 893 and 897.1(B).

*Id.* at 726.

Recently, in *State in the Interest of T.E.*, 11-1172 (La.App. 4 Cir. 9/19/12), 100 So.3d 963, the juvenile claimed on appeal that the court erred in imposing an out-of-home disposition immediately after adjudication without allowing him to present evidence. The fourth circuit found that the disposition hearing was waived under the following circumstances:

> The record reflects that before the adjudication hearing on July 18, 2011, defense counsel confirmed that defendant had not shown up to the Evening Reporting Center or to summer school as required by the court. The court inquired into the reason for defendant's absences, and explained that participation was an alternative to detention.

Defendant answered that he was afraid for his safety because "somebody" was after him and they knew how to find him. Indicating its intention to find a safe place for defendant, the court proceeded with the adjudication hearing.

After the matter was submitted, the court asked defense counsel if she would like to defer disposition. Defense counsel responded in the affirmative; then the court alternatively offered to go forward. Defense counsel responded that she would like a ruling on the guilt or innocence of defendant. The court replied: "Well, you know, I'll just give the ruling and the disposition at the same time. If you want to defer it then I'll just give the ruling." Defense counsel said: "That's fine." The court proceeded to adjudicate defendant a delinquent, then it gave a disposition recommending six months of non-secure care in the custody of the Office of Juvenile Justice, in a location outside of Orleans Parish. The court opined that this was in defendant's best interest due to concerns for his safety and stated that defendant would be held at the Youth Study Center pending placement. Claiming that she had no opportunity to present evidence to the court on defendant's behalf, defense counsel requested a stay of the execution of sentence. The court asserted that defense counsel had responded in the affirmative when asked if she wanted the court to give a disposition. Asserting that she misunderstood the court's question, defense counsel clarified that she had only wanted the court to issue an adjudication, then she objected to the defendant being taken into custody without an opportunity to present evidence on his behalf.

Next, defendant's grandmother indicated that they would be moving, and defense counsel urged the court, "at the very least," to revisit the issue after they had moved. Although the defendant claimed that he was supposed to enter a church program, neither he nor his grandmother had sufficient information regarding the program. Reiterating its concern for defendant's safety, the court maintained its original decision to have the defendant removed from his environment. However, it agreed to release him to his grandmother upon the receipt of sufficient information regarding the church program.

Defense counsel requested a hearing within 72 hours, where defendant would then be remanded if he was not in the program. The court agreed to a 72-hour status hearing, but kept defendant in custody for his safety, noting his grandmother's concern, and his grandmother agreed.

At that point, there was some confusion about whether the disposition was being deferred and the court asserted that it had already given its disposition. The court restated the disposition given and indicated that the next hearing would be a status hearing on whether the defendant would be released to attend the church program. At the court's request and without objection, defense counsel clarified that the status hearing was to present an alternative

16

to the disposition; however, she acknowledged that she was relying "largely" on the church program as an alternative.

The court asserted that there would be no hearing without further information on the church program. Subsequently, on July 21, 2011, the day of the status hearing, a court judgment indicated that defense counsel was unable to get the information for the program.

Considering the foregoing, we find that defendant waived his right to a disposition hearing. Although a failure to object to the court's immediate disposition without a hearing does not serve as a waiver; here, defense counsel made an initial objection, then waived that objection when she requested three days to present an alternative to the court's disposition and the court agreed to that alternative. The court recounted its disposition and stated that the hearing would be a status hearing. Defense counsel, without complaint, clarified the purpose for the status hearing and admitted that she was depending largely on the church program as an alternative disposition. The judgment from the status hearing reflects that defense counsel was unable to obtain information for the church program. The record reveals no further objection or request for reconsideration. Thus, by waiving his initial objection, defendant waived his right to a formal disposition hearing.

On appellate review, a disposition hearing may be deemed insufficient for the juvenile court's failure to hear evidence on the defendant's individual need for treatment or rehabilitation. *State ex rel. E.D.C.*, 39,892, (La.App. 2 Cir. 05/11/05), 903 So.2d 571. However, once this Court determines, as in this case, that the defendant has waived his right to the disposition hearing, no further inquiry into the hearing process is necessary.

*Id.* at 965-66 (footnote omitted).

In the instant case, the following exchange occurred at the close of the

adjudication proceeding:

THE COURT: I'll find the defendant guilty. Is there a recommendation?

MS. BROWN: I'd like a --

THE COURT: What?

MS. BROWN: Doesn't matter.

THE COURT: Is there a recommendation?

MS. BREAUX: I'm sorry? What did --

17

THE COURT: Is there a recommendation for sentencing?

MS. BREAUX: Yes, there is, Judge. Six (6) months with the Department of Youth Services and Corrections, suspended; six (6) months active supervised probation; forty (40) hours of community service. That is the recommendation.

THE COURT: Any response?

MS. BROWN: I'd like to ask that he not have the community service since he did the eleven (11) weeks at Teen Court.

THE COURT: That was -- Was it on this charge?

DEPUTY CLERK: No.

MS. BROWN: No, it was not on this charge.

THE COURT: It was on a different charge.

MS. BREAUX: Right.

THE COURT: No, I'm going to - - we'll sentence him in accordance with the State's recommendation.

Unlike in *State in the Interest of T.E.*, in T.H.'s case there was no objection or waiver of the objection, and there was no waiver of the disposition hearing. Consequently, we find that the disposition must be vacated and that the matter must be remanded for a disposition hearing, or a waiver thereof, in accordance with La.Ch.Code arts. 892 and 893.

At resentencing, the trial court should order credit for time T.H. spent in secure detention, if any, prior to the imposition of disposition, as required by La.Ch.Code art. 898(A). *See State in the Interest of J. F.*, 03-321, p. 8 (La.App. 3 Cir. 8/6/03), 851 So.2d 1282. Additionally, the trial court should inform T.H. of the two-year prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. *See State in the Interest of J.C.G.*, 97-1044 (La.App. 3 Cir. 2/4/98), 706 So.2d 1081 and *State ex rel. J. F.*, 851 So.2d 1282.

18

The probation order in this incorrectly states, "that the Juvenile having been adjudicated Delinquent for the following offense(s): THEFT < $300.00, THEFT < $300.00 14:67A" At the beginning of the proceeding, the State announced that it was proceeding on one count of theft. At the conclusion of the adjudication, the trial court stated: "I'll find the defendant guilty." This court hereby orders that the new probation order issued after the disposition hearing accurately reflect the transcript of the adjudication hearing. *See State v. Wommack*, 00-137 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62.

*Sufficiency of the Evidence*

T.H. challenges the sufficiency of the evidence.

In *State v. Hearold*, 603 So.2d 731, 734 (La.1992) (footnote omitted), the court held in pertinent part:

> When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt. When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot.

> On the other hand, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial. If the reviewing court determines there has been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to support the conviction, then the accused must receive a new trial, but is not entitled to an acquittal even though the admissible evidence, considered alone, was insufficient. *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).

T.H. argues that "[c]onsidering the conflicting testimony by state witnesses, the failure of the state to prove T.H. had a requisite intent to steal, and reliance on testimony concerning an unproduced surveillance video, the evidence was insufficient to convict T.H. of theft" and states that:

> T.H. did not make an inculpatory statement to law enforcement. Ms. Charles did not give a statement to law enforcement, nor did she testify at trial as to whether T.H. knew that a theft was going to occur. Both [Detective] Gerard and Ms. Hebert testified that when T.H. was arrested he had did not have a stolen item in his hands, or otherwise on his person. T.H. was not with Ms. Charles when she left the store. T.H. testified that he did not know that Ms. Charles intended to steal the shorts. The only thing that was proved beyond a reasonable doubt is that T.H. handed a pair of shorts to Ms. Charles.
>
> Further, the divergent testimony elicited from [Detective] Gerard and Ms. Hebert is detrimental to the state's case. [Detective] Gerard, a police officer with nine years of experience, testified that T.H. did not witness Ms. Charles placing the shorts in her bag. Ms. Hebert, a Walmart employee, testified that T.H. watched Ms. Charles place the shorts in her bag. If T.H. did not witness the theft take place, then the state has failed to prove, beyond a reasonable doubt, that he specifically intended for Ms. Charles to steal the item.

In *State v. Mitchell*, 13-426, p. 3 (La.App. 3 Cir. 11/6/13), 125 So.3d 586, 590 (quoting *State v. Spears*, 05-964, p. 2 (La. 4/4/06), 929 So.2d 1219, 1222), the court stated:

> When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See State v. Captville*, 448 So.2d 676, 678 (La.1984). That standard dictates that to affirm the conviction the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that the State proved all elements of the crime beyond a reasonable doubt. *State v. Johnson*, 03-1228, p. 4 (La.4/14/04), 870 So.2d 995, 998; *Captville*, 448 So.2d at 678.

In *State v. Thompson,* 13-194, pp. 2-3, 7-8 (La.App. 3 Cir. 10/9/13), 123 So.3d 360, 362, 365, this court explained in pertinent part:

The credibility of a witness is a matter of weight of the evidence, not sufficiency, and determination of the credibility is left to the finder of fact's sound discretion and will not be re-weighed on appeal. *State v. F.B.A.*, 07-1526 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, *writ denied*, 08-1464 (La.3/27/09), 5 So.3d 138.

. . . .

The appellate court's authority to review questions of fact in a criminal case is limited to the sufficiency of the evidence evaluation under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The appellate court's function is not to assess credibility or re-weigh the evidence. *State v. Helou*, 02-2302 (La.10/23/03), 857 So.2d 1024. "In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the fact finder, is sufficient support for a requisite factual conclusion." *State v. Dorsey*, 10-216, p. 44-45 (La.9/7/11), 74 So.3d 603, 634, *cert. denied*, --- U.S. ----, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012).

. . . .

"[*I]rrational* decisions to convict will be overturned, *rational* decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988) (emphasis in original). *See also State v. Perry*, 08-1304 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, *writ denied*, 09-1955 (La.6/25/10), 38 So.3d 352.

In *State v. Draughn,* 05-1825, pp. 7-8 (La. 1/17/07), 950 So.2d 583, 592-93,

*cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007), the court explained in pertinent

part:

Additionally, where circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, "assuming every fact to be proved that the evidence tends to prove." La. R.S. 15:438; *see State v. Neal*, 2000-0674 p. 9 (La.6/29/01), 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). The statutory requirement of La. R.S. 15:438 "works with the *Jackson* constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury." *Neal*, 2000-0674 p. 9, 796 So.2d at 657.

. . . .

21

Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); *Neal*, 2000-0674 p. 10, 796 So.2d at 657.

In *State v. Dotson*, 04-1414, p. 2 (La. App. 3 Cir. 3/2/05), 896 So.2d. 310, 313, the court explained:

> [W]hen the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. *State v. Camp*, 446 So.2d 1207 (La.1984); *State v. Wright*, 445 So.2d 1198 (La.1984). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded.

In *State v. Rabalais,* 99-623, p. 6 (La.App. 3 Cir. 1/26/00), 759 So.2d 836, 840, the court explained in pertinent part:

> Theft is defined in La.R.S. 14:67 as follows:
>
> Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representation. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
>
> The Louisiana Supreme Court expressed in *State v. Victor*, 368 So.2d 711, 713 (La.1979), there are three essential elements of the crime of theft which must be proved by the prosecution *beyond a reasonable doubt*:
>
> > 1. The "misappropriation or taking of anything of value which *belongs to another*,"
> >
> > 2. Either "without the consent of the other . . . or by means of fraudulent conduct,"
> >
> > 3. With "intent to deprive the other permanently" of the object of the taking or misappropriation.

In *State v. Brooks*, 00-106, p. 7 (La.App. 5 Cir. 9/26/00), 769 So.2d 1242, 1246 (footnotes omitted), the court explained in pertinent part:[2]

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

> This rule has important qualifications. Only those persons who knowingly participate in the planning or execution of a crime are principals. Mere presence at the scene is not enough to "concern" an individual in the crime. All persons "concerned" in the commission of an offense, either directly or indirectly, are principals in the crime, and culpable according to the mental state they possess at the time of the offense.

In *State v. Victor*, 368 So.2d 711, 714-15 (La.1979), the court explained:

> The factual issue of whether there is a "taking" for purposes of a theft concerns whether the offender exerts control over the object adverse to or usurpatory of the owner's dominion.

> For instance, under usual circumstances the ordinary shopper does not disturb the owner's dominion by handling goods displayed for sale. The mere fact that a customer has removed a large item from its package, in order to inspect it, will not ordinarily be any evidence of theft. In this instance, no inference arises of any intent to deprive the owner permanently of the object, nor does even any inference arise of a "taking" i. e., an intent to usurp or negate the owner's dominion.

---

[2]T.H. was not charged as a principal to the crime. However, in *State v. Peterson*, 290 So.2d 307 (La.1974), the court explained that is not necessary:

> Code of Criminal Procedure Article 464 requires that the indictment be a plain, concise and definite written statement of the essential facts constituting the offense charged. Article 465 of the Code of Criminal Procedure specifically authorizes the use of a short form indictment in charging murder. Nowhere, in any of our Code of Criminal Procedure provisions or elsewhere, is it required that a person charged with an offense who did not directly commit the act constituting the offense be specifically denominated a 'principal'. Any and all persons involved in the commission of a crime to an extent which will satisfy the definition of "principal" stated in R.S. 14:24, whether the direct perpetrator of the act constituting the offense or not, may be charged with commission of the offense. There is absolutely no requirement that an indictment explicitly denominate the accused as "principal". That the accused is indicted for the offense itself, and not charged as an accessory after the fact, irrefutably evidences that he is charged as a principal.

*Id*. at 308.

In the present case, the trial court could reasonably conclude from the evidence that the defendant had concealed the store's goods in the terrarium box and had then directed his daughters to the checkout counter (where they would be charged only for the less expensive terrarium but not for the goods concealed within the box).

The defendant's hiding the television set in the box is under the circumstances at least some evidence of a "taking", although it may not have given rise to an inference of an intention to deprive the owner permanently of the latter's property. Nevertheless, the trier of fact could conclude beyond a reasonable doubt from the evidence as a whole, not only a taking, but also an intent by it to deprive the owner permanently of the objects concealed in the terrarium box.

In this case, T.H. admits that he gave the swim trunks to Ms. Charles. The element or elements which the State was required to prove were a taking with intent to permanently deprive Wal-Mart of the swim trunks. The State's case is based upon circumstantial evidence.

T.H. denied taking the swim trunks with the intent to deprive Wal-Mart of them permanently. He asserts that he believed that Ms. Charles was going to buy him the swim trunks based upon what she told him at the store, and in the past, she had bought him things. T.H. denied seeing Ms. Charles put the swim trunks in her purse. T.H. testified that he became aware that Ms. Charles had not paid for the swim trunks only after being called into the security office. No merchandise from the store was found on T.H.

Ms. Hebert testified that T.H. saw Ms. Charles conceal them. As noted above, Ms. Hebert viewed this alleged action via closed caption television and testified to the following particulars:

- Q   [W]hile watching the security camera, was this gentleman in a position to see the young lady placing the items in her purse?
  A   Yes, he was.
  Q   Did he make an effort to stop the concealment?
  A   No, he did not.

- Q   [T.H.], what was he doing when the young lady put it in her purse?

24

A He was standing next to her. While she was placing merchandise inside of her purse, he was basically looking around, I guess, to see if anybody was --

- He is on her side . . . . [H]e is watching her with the merchandise as well as looking down aisles . . . .

- Q So if the officer said that he was not -- that he was looking in the other direction, that would not be correct?
A Correct. I mean, whenever she was concealing, he was watching her conceal, and then he also whenever -- like I stated, whenever she was concealing, when they continued to walk -- Because when they were concealing, they were stopped. Whenever they started concealing – or when they finished concealing, they started walking, and he was looking around to the side aisles.

Detective Gerard was asked several times about whether T.H. saw Ms. Charles conceal the swim trunks in the purse, and each time he said that T.H. was looking away or turned away from Ms. Charles when she concealed the item in her purse.

The State suggests that T.H. wadding up the swim trunks and wrapping a draw sting around the swim trunks was evidence of his intent to permanently deprive Wal-Mart of the swim trunks. But, other circumstantial evidence to support this element or elements is whether or not T.H. was aware that Ms. Charles exited the store without paying for the swim trunks. T.H. denied seeing Ms. Charles pass the checkout line. Ms. Hebert gave general testimony that they continued to follow the individuals until they came up to the front of the store and that after they passed all points of sale, entered the vestibule, she and Detective Gerard opened the door to the Loss Prevention office, and Detective Gerard asked the individuals to come in the office.

Detective Gerard explained that once T.H. and Ms. Charles started moving, they could not be seen on that particular camera and that he did not remember if Ms. Hebert followed them from that point but that he went to the door to wait for

25

them to come to the exit point. The detective stated that T.H. did not exit the store at the same time as Ms. Charles but that Ms. Charles exited first and that Detective Gerard stopped her at that time. He stated that T.H. "kind of hung back." Detective Gerard testified that when he stopped T.H. and brought him into the security office, Ms. Charles was already in the office.

We find that the State excluded T.H.'s hypothesis of innocence and affirm T.H.'s adjudication.

### *The Wal-Mart Surveillance Video*

T.H. argues the juvenile court judge erred when it overruled his objection to hearsay testimony concerning the Wal-Mart surveillance video. T.H. contends that the State did not make a showing that the video was destroyed or unavailable. T.H. points out that "[g]iven the divergent accounts of what occurred from the state's witnesses, the video should have been produced as not only best evidence but also as potentially exculpatory evidence." T.H. argues he suffered prejudice due to the surveillance video not being produced. T.H. argues:

> In this case, the failure by the state to provide defense with the best evidence of T.H.'s alleged offense resulted in prejudice because the tape would have confirmed that one of the state's witnesses did not testify accurately. Being that the only evidence the state had was the testimony of its two witnesses, actual evidence of the events that occurred would have had a reasonable likelihood of a different outcome of the trial.

> The contents of the surveillance video are highly relevant to the state's case against T.H. because it recorded the alleged actions of T.H. and Ms. Charles. Furthermore, [Detective] Gerard stated that after T.H. handed the shorts to Ms. Charles he turned his back as she placed the shorts in her purse. Ms. Hebert testified to the contrary, stating that T.H. watched Ms. Charles place the shorts in her purse.

> [Detective] Gerard's testimony is further corroborated by T.H.'s testimony that he did not see Ms. Charles place the shorts in her purse. T.H. testified he was unaware that she was going to steal the shorts. Thus, the material on the surveillance video, if it indeed shows that T.H. walked away and turned his back while Ms. Charles

placed the item in her purse, is material evidence that is relevant to the guilt or innocence of T.H.

The record indicates that T.H., in the motion for discovery, requested any electronic or video recordings that were favorable, material, and relevant to the issue of guilt or punishment and were intended to be used as evidence by the State at the trial. Additionally, at a motion hearing held on November 20, 2013, the defense requested the video. The State agreed if there was a video it would provide it to the juvenile.

The testimony of Detective Gerard and Ms. Hebert regarding the taking of the shorts was based upon what they observed through the video surveillance. At the adjudication hearing, when Detective Gerard began to describe what he saw on the video surveillance, T.H.'s attorney objected stating:

> MS. BROWN: Objection, Your Honor. If he's going to testify to the video, which we requested, and they say they don't have, then I'd like to object to that, because I think we should have been provided that, if he was going to testify and use that, if the State is going to use that in trial against my client.

The court ruled as follows:

> THE COURT: If there's a video, they'd be required to produce it; however, if there is no video, he is permitted to testify as to what he observed. So I'll overrule the objection.

There was no other discussion about the video of the surveillance. T.H. asserts that although the video was timely requested, there is no indication in the record that the State attempted to obtain it, and there is no evidence that it was destroyed or otherwise unavailable. T.H. argues that admission of the testimony without the tape was improper and violated his rights to due process under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963).

In its brief to this court, the State asserts that following the November 20, 2013, hearing, an email was sent to T.H.'s attorney, dated December 3, 2012, to

27

the effect that no video recording existed. The State attached a copy of the email to its brief. The State argues that the testimony of the security officers was admissible due to there being no bad faith on the part of the State for not producing the in-store surveillance video.

The email was not introduced into evidence by the State, there was no testimony or discussion in the record regarding the email, and it is not contained in the record. In *Denoux v. Vessel Management Services, Inc.,* 07-2143 (La. 5/21/08), 983 So.2d 84, 88-89, the court explained:

> Evidence not properly and officially offered and introduced cannot be considered, even if it is physically placed in the record. Documents attached to memoranda do not constitute evidence and cannot be considered as such on appeal. *See: Ray Brandt Nissan v. Gurvich*, 98-634 (La.App. 5th Cir.1/26/99), 726 So.2d 474; *Gulf Coast Bank and Trust Co. v. Eckert*, 95-156 (La.App. 5th Cir.5/30/95), 656 So.2d 1081; *City of Eunice v. CLM Equipment Co., Inc.*, 505 So.2d 976, 978 (La.App. 3rd Cir.1987); *Norton v. Thorne*, 446 So.2d 972, 974 (La.App. 3rd Cir.1984); *Wilkin-Hale State Bank v. Tucker*, 148 La. 980, 88 So. 239 (1921).

> Appellate courts are courts of record and may not review evidence that is not in the appellate record, or receive new evidence. La. C. Civ. P. art. 2164; *Gallagher v. Gallagher*, 248 La. 621, 181 So.2d 47 (1965); *Bullock v. Commercial U. Ins. Co.*, 397 So.2d 13 (La.App. 3rd Cir.1981); *Holmes v. St. Charles General Hosp.*, 465 So.2d 117 (La.App. 4th Cir.1985); *B.W.S., Jr. v. Livingston Parish School Board*, 02-1981, p. 2 (La.8/16/06), 936 So.2d 181, 182 (per curiam).

Since the email was not introduced into evidence, we cannot consider it. Without knowledge of the email, the record is less clear as to whether the trial court was ruling that there was no video or that it was an advisement. Nevertheless, the video was not available at the adjudication.

In *State v. Johnson*, 30,078, (La.App. 2 Cir. 12/10/97), 704 So.2d 1269, *writ denied*, 98-382 (La. 6/26/98), 719 So.2d 1054, the defendant, convicted of aggravated battery, argued on appeal the trial court committed error when it allowed testimony on the contents of an in-store surveillance videotape which was

28

erased prior to trial. The state elicited testimony from three people who testified that on the night of the shooting, they, along with store owner Mr. Ahmed, viewed this videotape of defendant's alleged activities. The videotape was inadvertently recorded over the following day and no longer existed. The court explained in pertinent part:

> The admissibility of a relevant videotape is well settled as being largely within the discretion of the trial judge. *Lafleur v. John Deere Co.,* 491 So.2d 624 (La.1986); *United States Fidelity & Guaranty Co. v. Hi-Tower Concrete Pumping Service*, 574 So.2d 424 (La.App. 2d Cir.), *writs denied*, 578 So.2d 136 (La.1991). The trial court must consider whether the videotape accurately depicts what it purports to represent, whether it tends to establish a fact of the proponent's case and whether it will aid the jury's understanding. Against those factors, the trial court must consider whether the videotape will unfairly prejudice or mislead the jury, confuse the issues or cause undue delay. The trial court may exclude the evidence if the factors favoring admission are substantially outweighed by the factors against admission. La.C.E. arts. 401-403; U.*S. Fidelity v. Hi-Tower*, *supra*.

> Here, we must specifically decide the admissibility and relevancy of testimony concerning the contents of a lost document, i.e. the Key Station surveillance videotape. While La.C.E. art. 1002 requires the original document to prove the contents therein, under La.C.E. art. 1004(1), the original of a writing, recording or photograph is not always required to prove its contents, and other evidence of the contents of a writing, recording or photograph is admissible if all originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith.

> The "best-evidence" rule is to be applied sensibly and with reason. *State v. Dilworth*, 358 So.2d 1254 (La.1978); and *State v. Cody*, 446 So.2d 1278 (La.App. 2d Cir.1984). Absent a showing of prejudice to the defendant, a conviction will not be reversed on the ground that the best evidence was not produced. *State v. Moore*, 419 So.2d 963 (La.1982); *State v. Gaskin*, 412 So.2d 1007 (La.1982); and *State v. Coleman*, 486 So.2d 995 (La.App. 2d Cir.1986). The "best evidence" rule does not mandate production of an original taped statement when testimony shows that the original is not available and there is no bad faith by the state. *State v. McDonald*, 387 So.2d 1116 (La.1980), *cert. denied*, 449 U.S. 957, 101 S.Ct. 366, 66 L.Ed.2d 222 (1980).

> This court applied these standards in *State v. Hayes*, 585 So.2d 619 (La.App. 2d Cir.1991). In *Hayes*, this court found no error in the trial court allowing into evidence the transcription of defendant Hayes' statement to the police when the audiotape had apparently been

destroyed and defendant could show no bad faith or prejudice. This court held in *Hayes* that the "best evidence" rule does not mandate the production of an original taped statement when testimony shows that the original is not available and there is no bad faith by the state.

In the present case, Lake Providence Chief of Police Timothy Middlebrook, police officer Edward Kennedy, and Defendant's parole and probation agent, J.D. Allen, all testified that they had viewed the videotape the night of the incident involving Defendant. Each witness testified that the tape showed the shirtless defendant yelling expletives and then firing a pistol into the store from the doorway. Mr. Ahmed testified that the video tape of these events was inadvertently deleted when the tape was recorded over the next day. The record does not show or suggest bad faith or prejudice on Mr. Ahmed's part in inadvertently permitting the evidence to be erased. Defendant suggests, in brief, hypotheses of bad faith, but offers no factual basis to any intentional wrongdoing on Mr. Ahmed's part. The three witnesses testified to the incriminating content of the videotape and Defendant's counsel enjoyed the benefit of a thorough cross-examination of each witness.

The testimony of the police officers and Defendant's parole officer as to the inculpatory content of the videotape of Defendant's activities, coupled with Mr. Ahmed's account, casts doubt as to the veracity of Defendant's alleged but unproven innocent activities. The trial court found "specifically that the tape was not intentionally or [sic] destroyed in bad faith." Since the trial court did not find Mr. Ahmed in bad faith, this court's holding in *State v. Hayes*, *supra*, necessitates the finding that the testimonies of these witnesses to the contents of the videotape were admissible. This assignment of error is without merit.

In *State v. Craft*, 12-76 (La.App. 3 10/3/12), 99 So.3d 1108, *writ denied*, 12-2389 (La. 4/19/13), 111 So.3d 1029, the defendant was convicted of possession of more than sixty, but less than two thousand, pounds of marijuana. On appeal, one of the assigned errors was the failure of the State to preserve the DVD recording of the traffic stop and his statement to police which prevented him from fully confronting the evidence used against him. The deputy's vehicle involved in the stop had an audio/video camera that recorded onto a hard drive and a disc. The deputy believed the camera was recording onto the disc at the time of the stop, and he intended to videotape the stop as he normally did. Shortly before trial, he learned that the equipment did not function properly and did not record. The

30

deputy testified at trial that the video would have shown the circumstances to which he testified had it worked properly. The officer to whom the defendant confessed was not concerned with a video or audio taped statement because he was not trying to obtain a confession, but to see where the drugs were going. This court held in pertinent part:

> [A]bsent a showing of prejudice, a conviction will not be overturned on the ground that the best evidence was not produced. [*State v. Gaskin*, 412 So.2d 1007 (La.1982) ]. It has been held that the testimony of one who hears a confession is always best evidence of it. *People v. Vaughn*, 155 Cal.App.2d 596, 318 P.2d 148 (1957). Likewise, testimony by participants of what was said in a conversation have been held as equally admissible as a tape of the conversation to establish what was said. *United States v. Gonzales–Benitez*, 537 F.2d 1051 (9th Cir.1976), *cert. denied*, 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291 (1976); *United States v. Rose*, 590 F.2d 232 (7th Cir.1978), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979). Louisiana courts have allowed officers to testify in the place of playing taped video or audio recordings of confessions to the jury.

*State v. McGuffie*, 42,069, p. 8 (La.App. 2 Cir. 8/1/07), 962 So.2d 1111, 1117, *writ denied*, 07–2033 (La.2/22/08), 976 So.2d 1283. The McGuffie defendant argued that the trial court erroneously allowed a police officer's testimony about his statements where the tapes of those statements had been lost. The second circuit noted, "The law does not require the production of nonexistent portions of a confession or portions which cannot be recalled." *Id.* at 1116 (citing *State v. Arnold*, 466 So.2d 520 (La.App. 3 Cir.), *writ denied*, 470 So.2d 124 (La.1985)).

Defendant had ample opportunity at the hearing on the motion to suppress and at trial to confront and cross-examine Deputy Leblanc and Agent Hazelwood about any relevant evidence. Certainly a video of the stop and the interview would have been helpful evidence. Its unavailability, however, does not create a Confrontation Clause issue where full cross-examination occurred, and the jury heard the testimony of those who had witnessed Defendant's confession. This assignment of error lacks merit.

*Id.* at 1114.

T.H. was able to cross-examine the security officers in the case. Detective Gerard and Ms. Hebert watched the same actions, at the same time, from the same place, on the same closed circuit. We find that the video was not material or relevant to resolve this issue of whether or not T.H. had the intent to permanently deprive Wal-Mart of the swim trunks. T.H. had the opportunity to cross-examine the security officers. Thus, T.H. failed to prove that any prejudice was suffered as a result of the video not being produced, and this assignment of error lacks merit.

## DECREE

T. H.'s adjudication is affirmed. However, the disposition is vacated and the matter is remanded for resentencing with instructions to the trial court to order credit for time spent in secure detention, if any, prior to the imposition of disposition, as required by La.Ch.Code art. 898(A), to inform T. H. of the two-year prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8, and to order the probation order to correctly reflect the adjudication hearing.

**ADJUDICATION AFFIRMED. DISPOSITION VACATED AND REMANDED.**

# COURT OF APPEAL

## THIRD CIRCUIT, STATE OF LOUISIANA

### 14-179

**STATE IN THE INTEREST OF T.H.**

**Cooks, J., dissents.**

T.H., a sixteen-year-old, was adjudicated a delinquent and found guilty of theft of an item valued at $75.78, a violation of La. R.S. 14:67. The trial court sentenced him to six months with the Office of Juvenile Justice, suspended the sentence, and placed him on active probation for a period of six months. The court also ordered T.H. to complete forty hours community service. T.H. appeals asserting the evidence was insufficient to support the conviction. The majority affirms the adjudication but would vacate the disposition and remand for resentencing. For the reasons stated below I disagree with the majority's decision.

Detective Tracy Gerard (Gerard) testified he was employed by the Lafayette Parish Sheriff's Office for nine years. He also worked as a security guard at Wal-Mart located on 1229 Northwest Evangeline Thruway. Gerard was working with Rachelle Hebert (Hebert), Asset Protection Manager for Wal-Mart, in the security office. While watching closed circuit television of the store from the security office, Hebert pointed out to Gerard two individuals in the shoe aisle, later identified as Ms. Charles and T.H.

In *State v. Bivens*, 2011-156, p. 4-5 (La.App. 3 Cir. 10/5/11), 74 So.3d 782, 788, *writ denied* 2011-2494 (La. 3/30/12), 85 So.3d 115, this court explained:

> There is sufficient evidence for conviction if the appellate court determines that 'the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable

1

doubt.' *State v. Hobley*, 98-2460, p. 33 (La. 12/15/99), 752 So.2d 771, 790, *cert. denied*, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed. 2d 61 (2000).

> Further, *when the conviction is based on circumstantial evidence*, La.R.S. 15:438 sets forth the rule that 'assuming every fact to be proved that the evidence tends to prove, in order to convict, *[the circumstantial evidence] must exclude every reasonable hypothesis of innocence.'* However, La.R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula; rather it serves as a helpful evidentiary guide for jurors when evaluating circumstantial evidence.

*State v. Major*, 03-3522, p. 6 (La. 12/1/04), 888 So.2d 798, 801. (citations omitted)

In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence. *State v. Chism*, 436 So.2d 464, 469 (La. 1983).

In this case, there is an important discrepancy between Detective Gerard's testimony and Hebert's testimony regarding what each observed simultaneously on the closed circuit video. The Detective working off-duty testified that *T.H. was looking the other direction and did not see Ms. Charles place the swimsuit in her purse nor did he observe T.H. see Ms. Charles place anything in her purse.* Both state's witnesses testified that T.H. was not with Ms. Charles when she passed the registers without paying for certain items including the swim shorts picked out by T.H.

The State did not introduce into evidence the swim shorts T.H. is accused of stealing, nor did it introduce into evidence Ms. Charles' purse allegedly used to

2

secret items to avoid paying for them, and it did not produce the video surveillance tape referred to by Hebert and Gerard in their testimony. There is no evidence or testimony to the effect that the video tape was either lost or destroyed. It simply was not produced despite T.H.'s timely request for production of that evidence. The only way to know which of the two versions of the observations of T.H.'s activities is correct would be to view the video surveillance tape which was not produced by the State. Without it, T.H.'s un-rebutted testimony, corroborated by Detective Gerard's testimony, establishes a reasonable hypothesis of innocence which forecloses the possibility of a valid conviction beyond a reasonable doubt.

The majority agrees that this is not a question of credibility of witnesses. Viewing the same events on closed circuit TV, each witness gave a different but equally credible version of what they saw. Hebert made inferences from what she observed and characterized T.H.'s behavior as suspicious, describing him as a lookout in the situation, but the Detective admits on cross examination that it can only be said that T.H. was looking away from Ms. Charles when she secreted the alleged swim shorts in her purse. This difference in testimony is not a question of credibility and I am unwilling to make the same "inference" as Ms. Hebert made as it is based solely on her personal predilections. The majority should not base a conviction on the personal inferences and predilections of an interested witness. The Detective's testimony substantiates T.H.'s testimony that he did not see Ms. Charles place the alleged swim suit in her purse and substantiates his testimony that he was not with Ms. Charles when she went through the checkout register without paying for the shorts she had secreted in her purse.

3

T.H. was convicted of a violation of La.R.S. 14:67. In *State v. Rabalais,* 99-623, p. 6 (La.App. 3 Cir. 1/26/00), 759 So.2d 836, 840 (emphasis added) this court explained in pertinent part:

Theft is defined in La.R.S. 14:67 as follows:

Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representation. *An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.*

The Louisiana Supreme Court expressed in *State v. Victor*, 368 So.2d 711, 713 (La.1979), there are three essential elements of the crime of theft which must be proved by the prosecution *beyond a reasonable doubt*:

1. The "misappropriation or taking of anything of value which *belongs to another*,"

2. Either "without the consent of the other . . . or by means of fraudulent conduct,"

3. With "intent to deprive the other permanently" of the object of the taking or misappropriation.

In *State v. Brooks*, 00-106, p. 7 (La.App. 5 Cir. 9/26/00), 769 So.2d 1242, 1246 (footnotes omitted) (emphasis added) the court explained in pertinent part the rule by which to determine whether one can be convicted as a principal to a criminal offense:

All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

This rule has important qualifications. *Only those persons who knowingly participate in the planning or execution of a crime are principals. Mere presence at the scene is not enough to "concern" an individual in the crime.* All persons "concerned" in the commission of an offense, either directly or indirectly, are principals in the crime,

4

and culpable *according to the mental state they possess at the time of the offense.*

In *State v. Victor*, 368 So.2d 711, 714-15 (La.1979), the court explained:

> The factual issue of whether there is a "taking" for purposes of a theft concerns whether the offender exerts control over the object adverse to or usurpatory of the owner's dominion.
>
> For instance, under usual circumstances the ordinary shopper does not disturb the owner's dominion by handling goods displayed for sale. The mere fact that a customer has removed a large item from its package, in order to inspect it, will not ordinarily be any evidence of theft. In this instance, no inference arises of any intent to deprive the owner permanently of the object, nor does even any inference arise of a "taking" i. e., an intent to usurp or negate the owner's dominion.

In this case, T.H. testified he gave the swim trunks to Ms. Charles. The element or elements which the State was required to prove were a taking with intent to permanently deprive Wal-Mart of the swim trunks by T.H. The State's case is based solely upon circumstantial evidence and the conflicting testimony by the State's witnesses. There is no direct evidence as to this essential element of the crime charged. A similar issue arose in *State v. Hunter*, 09-1487 (La. App. 3 Cir. 6/2/10), 41 So.3d 546, which involved circumstantial evidence and conflicting testimony as to the element of constructive possession of cocaine. In *Hunter*, this court found the state failed to prove constructive possession beyond a reasonable doubt, explaining in pertinent part:

> The crack cocaine at issue was found under a chair in the home of James Vertner. Thus, the State was required to prove the Defendant had constructive possession of the cocaine. There are several factors to consider when determining whether the Defendant had constructive possession of the crack cocaine which are set out below.
>
> *Knowledge*
>
> The crack cocaine at issue was found under a chair in which Michael Paige had been sitting. Michael testified that the crack was in his possession, he placed it in the back of the chair, and the

5

Defendant knew nothing about it. There was, however, testimony by Trooper Horton and Detective Dunn *that they believed the Defendant and Michael were part of a drug organization. However, Michael denied any participation in the organization and the Defendant was not asked if he was part of the organization.*

*Relationship with the Person Found in Actual Possession*

Neither Michael nor the Defendant actually possessed the crack cocaine when it was discovered by police. *There is no evidence of a relationship between Michael and the Defendant other than testimony by Trooper Horton and Detective Dunn that they believed the Defendant and Michael were part of a drug organization.*

*Access to the Area*

Vertner, the homeowner, testified that when police entered his home, the Defendant was in the kitchen by the sink and the ice box and he sat down at that time. Vertner did not testify where the Defendant sat. Babers, who was also inside the home when the Defendant entered, testified that the Defendant stood by the table, went toward the front door, and returned to the table. He testified that the Defendant never sat on the cooler.

Michael testified that the Defendant sat at the table and never sat on the cooler. The Defendant testified that he stood between the table and the love seat, which was across from the chair Michael sat in. He walked toward the front door then returned to the table, which was where he was when police entered the home. After police asked who got out of the vehicle, he sat in a chair. The Defendant did not indicate what chair he sat in.

Trooper Horton testified that the Defendant was standing by the chair when he entered the residence and later testified that he was sitting on a cooler next to the chair Michael sat in. Detective Henson also testified that the Defendant was sitting on the cooler next to the chair.

*Evidence of Recent Drug Use*

There was no evidence presented regarding recent drug use by the Defendant.

*Physical Proximity to the Drugs*

The Defendant and Michael were in the same vehicle for a short period of time prior to the vehicle being stopped by police.

Testimony of police put the Defendant next to the chair under which the crack cocaine was found. However, the testimony of other witnesses indicates the Defendant was not next to the chair. We are unaware of the size and layout of Vertner's home. Additionally, Detective Henson testified that photographs are typically taken in cases such as this. However, no photos were taken in the case at bar.

We find the evidence regarding the Defendant's proximity to the drugs is conflicting.

*Evidence that the Area was Frequented by Drug Users*

There was no testimony that Vertner's home was frequented by drug users.

. . . .

In the case at bar, the Defendant was in the company of an individual who admitted to possessing crack cocaine. *However, there was no evidence the Defendant was aware that Michael possessed cocaine. Further, there was no evidence that the Defendant and Michael were in an area frequented by drug dealers.*

*PRINCIPAL*

In its closing argument, the State asserted that Michael possessed the crack cocaine and the Defendant was a principal to the offense of possession with intent to distribute crack cocaine.

. . . .

We find this case is most similar to [*State v.*] *Brady*, [97-1095 (La.App. 4 Cir. 2/3/99)] 727 So.2d 1264, in which Brady had drugs in his pocket and the court concluded that Howell did not have constructive possession of those pills. Further, although the State would have the jury believe that the Defendant and Michael were part of a drug organization, there was no testimony regarding surveillance that linked the Defendant to the drug organization as there was in *Lewis*, 965 So.2d 971. There was, however, a recorded conversation between the Defendant and Marvin Paige, but the two did not openly discuss drugs during that conversation. *Thus, the State failed to present proof that the Defendant directly committed the act constituting the offense, aided and abetted in its commission, or directly or indirectly counseled or procured Michael to commit possession with intent to distribute crack cocaine.*

For the reasons asserted herein, we find the State did not prove the Defendant was a principal to Michael's possession with intent to distribute crack cocaine.

*RESPONSIVE VERDICTS*

"[W]hen a court finds that the evidence was not sufficient to support a verdict for the crime charged, the discharge of the defendant is neither necessary nor proper when the evidence supports a conviction of a lesser and included offense which is a legislatively authorized responsive verdict." *State v. Wright*, 36,635, p. 12 (La.App. 2 Cir. 3/7/03), 840 So.2d 1271, 1279. The responsive verdicts to the crime of possession with intent to distribute crack cocaine are attempted possession with intent to distribute crack cocaine, possession of crack cocaine, attempted possession of crack cocaine, and not guilty. La.Code Crim.P. art. 814(49).

We find the State cannot prove the Defendant committed any of the responsive verdicts, as the *State failed to prove the Defendant constructively possessed the crack cocaine or was a principal* to Michael's possession thereof. Therefore, the Defendant's conviction is vacated and his sentence set aside.

*Id.* at 555-62.

T.H. denied taking the swim trunks with the intent to deprive Wal-Mart of them permanently. He believed Ms. Charles was going to buy him the swim trunks based upon what she told him at the store. He testified she had bought things for him in the past. T.H. denied seeing Ms. Charles put the swim trunks in her purse. T.H. testified he only became aware that Ms. Charles had not paid for the swim trunks after being called into the security office. No merchandise from the store was found on T.H.

Like the officers in *Hunter*, Hebert testified according *to what she believed* the actions of T.H. meant to her characterizing T.H.'s looking the other way as making him a lookout for store security aiding Ms. Charles in the theft of goods from Wal-Mart. Hebert testified that T.H. saw Ms. Charles conceal the swim shorts. Hebert viewed these alleged actions via closed caption television and testified as follows:

- Q. [The State] [W]hile watching the security camera, was this gentleman in a position to see the young lady placing the items in her purse?
  A [Ms. Hamilton]. Yes, he was.

8

Q. Did he make an effort to stop the concealment?

A. No, he did not.

- Q. [M]r. Hamilton, what was he doing when the young lady put it in her purse?
  A. He was standing next to her. While she was placing merchandise inside of her purse, *he was basically looking around, I guess, to see if anybody was --*

Detective Gerard, who was watching T.H. and Ms. Charles on the same television monitor at the same time as Hebert, corroborated T.H.'s testimony that T.H. did not see Ms. Charles place the swim trunks in her purse. Detective Gerard was asked several times about whether T.H. saw Ms. Charles conceal the swim trunks in the purse, and each time he said T.H. was looking away or turned away from Ms. Charles when she concealed the item in her purse.

Other circumstantial evidence to support this essential element of the crime charged was whether or not T.H. was aware Ms. Charles exited the store without paying for the swim trunks. T.H. denied seeing Ms. Charles pass the checkout line. Hebert testified:

A. We continued to follow the individuals until they came up to the front of the store. After they passed all points of sale, entered the vestibule, we opened the door to the Loss Prevention office and Deputy Gerard asked the individuals to come in the office.

But, Gerard gave a very different account. He explained:

A. *Once they started moving, we lost them off of that particular camera.*

Q. Okay.

A. And then -- I don't remember if Rachelle followed them from that point. I went to the door to wait for them to come to the exit point.

Detective Gerard then explained that T.H. did not exit the store at the same time as Ms. Charles. According to Gerard, Ms. Charles exited first and Gerard stopped her at that time. Gerard testified when he stopped T.H., and brought him into the security office, Ms. Charles was already in the office.

I believe the State failed to exclude the reasonable hypothesis of innocence that T.H. thought Ms. Charles was going to purchase the swim trunks and that he was unaware she secreted them in her purse to avoid paying for them. As in *Hunter*, the State presented conflicting evidence. Gerard and Hebert had differing accounts or characterizations of the concealment. Additionally, although there was general testimony that T.H. and Ms. Charles passed the checkout points, T.H.'s testimony that he was not with Ms. Charles when she passed the checkout line and failed to pay for the swim trunks was supported by Detective Gerard's testimony. T.H.'s testimony that Ms. Charles offered to buy him the swim trunks, and that she had purchased things for him in the past, was un-rebutted by the State. Furthermore, there was no testimony that T.H. knew Ms. Charles planned to steal the shorts. The State failed to prove the charged offense, any lesser included offense, or that T.H. was guilty as a principal.

I also believe T.H. correctly asserts that the admission of Gerard and Hebert's testimony without the video tape of what they say they viewed over the closed circuit TV was improper and violates his due process rights *under Brady v. Maryland,* 373 U.S. 83, 83 S.C.t 1194 (1963).

In *State v. Johnson*, 30,078, (La.App. 2 Cir. 12/10/97), 704 So.2d 1269, *writ denied*, 98-382 (La. 6/26/98), 719 So.2d 1054, the defendant, convicted of aggravated battery, argued on appeal the trial court committed error when it allowed testimony on the contents of an in-store surveillance videotape which was

erased prior to trial. The state elicited testimony from three people who testified

that on the night of the shooting, they, along with store owner Mr. Ahmed, viewed

this videotape of defendant's alleged activities. The videotape was inadvertently

recorded over the following day and no longer existed. The court explained in

pertinent part:

> The admissibility of a relevant videotape is well settled as being largely within the discretion of the trial judge. *Lafleur v. John Deere Co.,* 491 So.2d 624 (La.1986); *United States Fidelity & Guaranty Co. v. Hi-Tower Concrete Pumping Service*, 574 So.2d 424 (La.App. 2d Cir.), *writs denied*, 578 So.2d 136 (La.1991). The trial court must consider whether the videotape accurately depicts what it purports to represent, whether it tends to establish a fact of the proponent's case and whether it will aid the jury's understanding. Against those factors, the trial court must consider whether the videotape will unfairly prejudice or mislead the jury, confuse the issues or cause undue delay. The trial court may exclude the evidence if the factors favoring admission are substantially outweighed by the factors against admission. La.C.E. arts. 401-403; U.*S. Fidelity v. Hi-Tower*, *supra*.
>
> Here, we must specifically decide the admissibility and relevancy of testimony concerning the contents of a lost document, i.e. the Key Station surveillance videotape. While La.C.E. art. 1002 requires the original document to prove the contents therein, under La.C.E. art. 1004(1), the original of a writing, recording or photograph is not always required to prove its contents, and other evidence of the contents of a writing, recording or photograph *is admissible if all originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith.*
>
> The "best-evidence" rule is to be applied sensibly and with reason. *State v. Dilworth*, 358 So.2d 1254 (La.1978); and *State v. Cody*, 446 So.2d 1278 (La.App. 2d Cir.1984). Absent a showing of prejudice to the defendant, a conviction will not be reversed on the ground that the best evidence was not produced. *State v. Moore*, 419 So.2d 963 (La.1982); *State v. Gaskin*, 412 So.2d 1007 (La.1982); and *State v. Coleman*, 486 So.2d 995 (La.App. 2d Cir.1986). The "best evidence" rule does not mandate production of an original taped statement *when testimony shows that the original is not available and there is no bad faith by the state. State v. McDonald*, 387 So.2d 1116 (La.1980), *cert. denied*, 449 U.S. 957, 101 S.Ct. 366, 66 L.Ed.2d 222 (1980).
>
> …

> *Mr. Ahmed testified that the video tape of these events was inadvertently deleted when the tape was recorded over the next day.*

> …

> <u>The trial court found "specifically that the tape was not intentionally or [sic] destroyed in bad faith."</u> Since the trial court did not find Mr. Ahmed in bad faith, this court's holding in *State v. Hayes*, *supra*, necessitates the finding that the testimonies of these witnesses to the contents of the videotape were admissible.

Significantly, in this case, t*here is no showing that the video tape, the best evidence of what actually occurred, was either lost or destroyed.* It was simply never produced despite Defendant's efforts to get the tape. The video would have been material and relevant to resolve the conflicting testimony of Hebert and Gerard in determining whether or not T.H. had the intent to permanently deprive Wal-Mart of the swim trunks. Consequently, T.H. suffered prejudice by the video not being made available. His adjudication should be reversed and his disposition should be vacated. I must respectfully dissent from the majority's decision.